**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Paul BROWN et al., Defendants-Appellants.**

**No. 74–1182.**

United States Court of Appeals, Seventh Circuit.

Argued June 6, 1974.

Decided July 3, 1974.

Rehearing Denied July 25, 1974.

Edward M. Genson, Allan A. Ackerman, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Michael D. Groark, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CLARK,[*] Associate Justice, SPRECHER, Circuit Judge, and BEAMER,[**] District Judge.

SPRECHER, Circuit Judge.

This appeal pivots upon the validity of a warrantless "border search" made at Chicago which resulted in the discovery of a large quantity of cocaine.

I

Seven defendants, including three men (Paul Brown, Cometas Dilanjian and Thomas Sheridan) and two sets of sisters (Mary Ann and Susan Prader, and Ellen Sue and Sandra Stewart) were indicted in Count I for conspiracy in violation of 21 U.S.C. § 963 to import cocaine into the United States in violation of 21 U.S.C. § 952(a) and to distribute cocaine outside the United States knowing that it would be imported in violation of 21 U.S.C. § 959. In addition, the Prader sisters were indicted in Count II of importing 1,917.3 grams of cocaine in violation of section 952(a) and the Stewart sisters were indicted in Count III of distributing the same quantity knowing it would be imported, in violation of section 959.

The indictment alleged and all the defendants admitted at the time of pleading guilty to all counts that in March, 1973, the men and the Prader sisters discussed at Chicago, Illinois, the importation of cocaine; that on April 2, 1973, the Praders traveled by airplane from Chicago to Acapulco, Mexico; that on

---

[*] Associate Justice Tom C. Clark of the Supreme Court of the United States (Retired) is sitting by designation.

[**] District Judge George N. Beamer of the Northern District of Indiana is sitting by designation.

April 5, the Stewarts traveled from Peru, South America, where they received the cocaine, to Acapulco, where they delivered it to the Praders a few days later; and that on April 8, the Praders traveled by airplane from Acapulco to Chicago, carrying the 1,917.3 grams on their persons.

Mary Ann Prader had passed through Customs inspection at O'Hare International Airport on April 8 and was waiting a short distance from the inspection area for her sister. As Susan Prader was going through the Customs line, Customs Patrol Officer Goodson observed that her dress or skirt "fitted rather tightly at the waistline and then sort of flared out to a length to perhaps to her ankles" resulting in a bulge in the area of her stomach. He became suspicious because the clothing did not appear normal on her slender frame. Goodson then escorted Susan to a private search room and sought the assistance of Sharon Holihan and Violet Anderson, two female employees of the Customs Service.

According to Mrs Holihan's testimony at the suppression hearing, "we were told by . . . Goodson that he was suspicious of Susan Prader because of her long clothing and mostly because she appeared to have a bulge on her abdomen below her waist." When the three women were alone, the Customs inspectors advised Susan that they were concerned with the bulge in the area of her waist or midriff, whereupon she voluntarily unzipped her skirt, pushed it four to six inches below her waist to expose her abdomen, then held the skirt at that point for a few seconds and brought it back up.

Because this movement was done without any instructions from the Customs inspectors and because Susan "pushed the skirt down and then stopped . . . and brought it back up," Mrs. Holihan "became suspicious that perhaps she had something underneath her skirt further down on her legs." Without removing any clothing, Mrs. Holihan lifted Susan's skirt up from the bottom to above her knees where she discovered packages bandaged or taped to her legs. One of the inspectors then left the private room and advised Goodson of their discovery. After the contents of the packages were field tested and found positive, Goodson identified himself to Mary Ann and took her back to the inspection room, where similar packages were found taped to her legs.

An evidentiary hearing was held on December 19, 1973 upon the motions of Susan and Mary Prader to suppress the items seized from their persons at O'Hare Airport on April 8. On December 27, the court denied the motions in a written opinion in which it relied in part upon United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

On January 16, 1974 the three male defendants and the Prader sisters pleaded guilty and on the following day the Stewarts also pleaded guilty. In accepting the Praders' pleas, the district judge said that "I think you could preserve your right to appeal on . . . [the motion to suppress] even if you plead guilty, subject to that condition."

The government did not acquiesce in the "condition" purporting to preserve the right to appeal the suppression question. In fact the prosecutor pointed out that if pleading guilty did not result in the waiver of the right to appeal "every defendant that comes into the building . . . [for] sentencing to see what they get, and if they don't like what they get . . . then they take it up on appeal."

The three male defendants were each sentenced to three years' imprisonment, Susan Prader and Sandra Stewart each to one year, and Mary Ann Prader and Ellen Sue Stewart each to six months' imprisonment.

All seven defendants appealed. The Praders argued that their motions to suppress should have been granted. The other defendants argued the voluntariness of their guilty pleas and their standing to seek suppression of the evi-

dence found on the persons of the Praders.

The government argued that the Praders waived the suppression question by pleading guilty, that the other defendants had no standing to raise it, that in any event the suppression motions were properly denied, and that the guilty pleas were voluntary and in full compliance with Fed.R.Crim.P. 11.

## II

The facts of this case in relation to the suppression question are quite similar to those in United States v. Cox, 464 F.2d 937, 944 (6th Cir. 1972), where the Sixth Circuit observed that "the district court allowed defendants the best of two worlds" in that "[t]hey were allowed to plead guilty to reduced charges, while reserving their right to appeal as if they had maintained their innocence through trial." The court concluded that the procedure of allowing an appeal on non-jurisdictional grounds following intelligent and voluntary pleas of guilty violated public and judicial policy and "will not be countenanced in the future in this Circuit." 464 F.2d at 945. Nevertheless the court decided in that case to honor the agreement entered into between the defendants and the prosecutor and accepted by the district court, as being required by the plea bargaining process. In the present case the prosecutor did not consent to the availability of the right of appeal as part of any plea bargaining.

The rationale of Cox appears to find support in Tollett v. Henderson, 411 U.S. 258, 267, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235 (1973), where the Supreme Court said:

> We thus reaffirm the principle recognized in the Brady trilogy:[1] a guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in McMann. (Footnote supplied.)

■ However, as the Cox court, we hesitate to refuse to consider the merits of the suppression question inasmuch as the district court held out some reason for the defendants to believe that they were pleading guilty "subject to that condition," albeit lacking the consent of the prosecutor to that condition. Cf. Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). We proceed therefore to a consideration of the propriety of the district court's denial of the motions for suppression.

## III

■ Although Chicago is more than 1200 miles from the Mexican border, the search of the Prader sisters at O'Hare International Airport upon their arrival on a nonstop flight from Acapulco constituted a border search.[2]

19 U.S.C. § 482 provides in part as follows:

> Any of the officers or persons authorized to board or search vessels may stop, search, and examine . . . any . . . person, on . . . whom he or they shall suspect there is merchandise which

---

1. Brady v. United States, 397 U.S. 742, 750, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), McMann v. Richardson, 397 U.S. 759, 770, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), and Parker v. North Carolina, 397 U.S. 790, 90 S. Ct. 1458, 25 L.Ed.2d 785 (1970).

2. ". . . [A] search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search." Almeida-Sanchez v. United States, 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973).

. . . shall have been introduced into the United States in any manner contrary to law . . .; and if any such officer or other person so authorized shall find any merchandise on or about any such . . . person . . . which he shall have reasonable cause to believe . . . to have been unlawfully introduced into the United States . . ., he shall seize and secure the same for trial.

"When a person or vehicle is detained at the border just after entering the Country, the agent's statutory authority to search is virtually unfettered except perhaps as to due process concerning the manner, not the cause, of the search. . . . Presumably, they are limited only by common standards of decency and propriety." United States v. Storm, 480 F.2d 701, 704 (5th Cir. 1973). "Border searches, absent search warrants or probable cause, have been uniformly upheld by the Courts as long as the customs agents have had a reasonable suspicion of violations of the customs laws." United States v. Thompson, 475 F.2d 1359, 1362 (5th Cir. 1973).

What is required to be balanced in any particular case is the level of suspicion of the agent against the level of indignity perpetrated upon the traveler. "Mere suspicion" does not justify a search within body cavities, Henderson v. United States, 390 F.2d 805, 808 (9th Cir. 1967), nor the administration of emetics, United States v. Guadalupe-Garza, 421 F.2d 876, 879 (9th Cir. 1970). Although both of those cases obviously involved a greater indignity than simply a strip search, *Henderson* suggested that strip searches should require a "real suspicion," 390 F.2d at 808, and *Guadalupe-Garza* defined "real suspicion."

"Real suspicion" justifying the initiation of a strip search is subjective suspicion supported by objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect that a particular person seeking to cross our border is concealing something on his body for the purpose of transporting it into the United States contrary to law. 421 F.2d at 879.

The indignity in the present case did not rise to a stripping or strip search. Susan Prader, in a private room in the presence of two other women, voluntarily pulled her skirt a few inches down from her waist and bared her midriff for a few seconds. Shortly thereafter one of the female inspectors lifted Susan's ankle-length skirt to a point just above her knees. She was not requested to nor did she strip, nor did the female inspectors strip her.

The suspicion developed first in the mind of the male Customs inspector who found an incongruity in a long, flared skirt with a waistline bulge on a slender girl.

In United States v. Berard, 281 F. Supp. 328 (D.Mass.1968), suspicious bulges on the persons of two travelers were found to warrant the opening of their shirts, which revealed them both to be bound in tape from waist to armpits with plastic bags of heroin. In United States v. Glaziou, 402 F.2d 8 (2d Cir. 1968), nervousness and a waistline bulge justified a touching and squeezing search which revealed heroin. In Shorter v. United States, 469 F.2d 61, 64 (9th Cir. 1972), heavy clothing in warm weather and a "bulge, or irregularity, in his shirt at the waist line" provided a sufficient basis for requiring the traveler to remove his overcoat and suit coat and to empty his pockets, whereupon he voluntarily lifted his shirt, revealing a waist girdle with plastic bags of heroin.

In United States v. Price, 472 F.2d 573 (9th Cir. 1973), a strip search had been conducted on the basis of a female traveler's nervousness during questioning and a suspicious bulge around her waist. Heroin and cocaine were eventually found concealed between her lower limbs. A majority of the court found the search to be excessive since early in the examination it became apparent that

the suspicious bulge was simply body fat. In a dissenting opinion, Judge Kilkenny pointed out the distinction between a strip search and a body cavity search and concluded that the inspectors had a "real suspicion" sufficient to conduct the subsequent strip search.

In the present case there was no strip search. Susan Prader testified that none of her clothing had been removed. In addition, although Susan's voluntary baring of her midriff had indicated, as in *Price*, that the bulge at her waist was not contraband, that very act developed a new suspicion in the minds of the inspectors. As Mrs. Holihan testified, the quick, unrequested lowering of her skirt top a few inches but no lower, followed by the rapid pulling of the skirt back up, caused Mrs. Holihan to become suspicious "that perhaps she had something underneath her skirt further down on her legs." We conclude that the inspectors harbored "real suspicion." Both Goodson and Holihan were experienced Customs inspectors, Goodson for thirteen years and Holihan for three years. The district judge who observed and heard the testimony concluded:

> The patrol officer had a reasonable suspicion concerning what might be on Susan's person, and this justified detaining her for a reasonable search of her person beyond the specified part which had aroused suspicion. . . . Furthermore the experenced searching agent acquired her own suspicion because of the defendant's actions during the initial search.

> The further search turned up the packages, and these in turn afforded the patrol officer with reasonable grounds to suspect sister Mary Ann who had been passed previously. . . . We see no reaon why this subsequent suspicion need to occur only while the suspect was within the confines of the inspection area; Mary Ann was still inside the International Building, a mere fifteen feet outside the door of the inspection area, and she admittedly had no intention of leaving the building before her sister.

In United States v. Glaziou, 402 F.2d 8, 14–15 (2d Cir. 1968), two seamen had exited the pier gatehouse and were 200 feet up the street when the Customs officer noticed the waistline bulge around one of them. The court approved the search of both of them, concluding that "the officers were justified in searching Lemieux as soon as the contraband was uncovered on his companion." Here the material found on Susan was field tested and determined to be cocaine before Mary Ann was searched. The search of Mary Ann consisted also of only the lifting up of her skirt.

Upon the question of the possible indignity suffered by the sisters, the district judge found:

> Nor was this an offensive invasion of defendants' privacy. . . . The two searches which produced the results could have been performed by a thorough pat-down in public, particularly if defendants had not been wearing the long full skirts which in part caused the suspicion which led to the searches in the first place.

Actually the skirts of each girl were lifted in a completely private room in the presence only of the two female inspectors.

We conclude that the level of suspicion was high enough to justify the relatively dignified search to which both girls were subjected. The trial court correctly denied the motions to suppress the evidence obtained in the searches.

## IV

Inasmuch as we find the searches and seizures relating to the Praders to have been justified, we need not consider the standing of the other defendants to challenge the evidence produced thereby. *Cf.* Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

In regard to the interrogation of the defendants by the court before accepting their guilty pleas, we conclude that the court adequately addressed each defend-

ant personally and determined that the plea was made voluntarily with understanding of the charge and the consequences of the plea as required by Rule 11 as it read at the time of the trial and as it now reads.[3]

Specifically, the Stewart sisters complained that they were not advised of the three-year special parole term, but prior to sentencing when they still had the opportunity to withdraw their guilty pleas, the court discussed the parole term in the presence of all defendants and their counsel.

In regard to defendant Sheridan, it was argued that it was not sufficiently determined whether his known use of methadone influenced his plea. The record shows that the court spent a relatively long period of time in the presence of all of the defendants at the acceptance of the pleas and again at sentencing and addressed all of them, including Sheridan, personally on several occasions. At sentencing, a representative of the Methadone Maintenance Institute was present and said:

> Mr. Sheridan is a patient at the Methadone Maintenance Institute. He has been very faithful in his attendance at the clinic. We have weekly therapy sessions. Mr. Sheridan has come to those sessions on a sort of regular basis. We feel that he is trying very hard to participate well in the program. We feel that his regular attendance is testimony to that fact.

Whereupon the following took place:

> THE COURT: Well, Mr. Sheridan's statement to the probation officer is, apparently, that he was not getting very much treatment from your organization and apparently wasn't benefitting very much from it.
>
> Is that correct?

3. On April 23, 1974, the Supreme Court approved and transmitted to Congress, to take effect on August 1, 1974 if approved, amendments to the Federal Rules of Criminal Pro-

> DEFENDANT SHERIDAN: No sir. That was the Veterans Administration when I was under the program over there. I switched over to the Methadone Maintenance Institute which is much better, really.
>
> THE COURT: When did you switch over?
>
> DEFENDANT SHERIDAN: I started in August at the VA and I switched over in about September, I believe.
>
> THE COURT: Of '73?
>
> DEFENDANT SHERIDAN: Yes.

Inasmuch as Sheridan never contended that he was under the influence of drugs at the time of his plea, in view of his satisfactory treatment for about five months prior to his plea, and because of the court's close personal observation of him, we conclude that Sheridan's guilty plea, as that of the other defendants, was voluntary.

Convictions of all defendants are affirmed.

Affirmed.

cedure, including an amended Rule 11. *See* Moody v. United States, 497 F.2d 359 (7th Cir. 1974).