**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jimmie C. DORSEY,
Defendant-Appellant.**

**No. 80–1282.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1980.

Decided March 4, 1981.

Rehearing Denied May 19, 1981.

Raymond D. Pijon, Chicago, Ill., for defendant-appellant.

James R. Ferguson, Asst. U. S. Atty., Thomas P. Sullivan, U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS and CUDAHY, Circuit Judges, and CAMPBELL, Senior Judge.*

CUDAHY, Circuit Judge.

Defendant-appellant Jimmie Dorsey appeals from a judgment of conviction for illegal importation of cocaine. 21 U.S.C. § 952(a). Specifically, Dorsey appeals the district court's denial of his motion to suppress certain evidence. We affirm.

I

On August 14, 1979, Dorsey arrived at O'Hare International Airport from Kingston, Jamaica. A customs agent at O'Hare examined Dorsey's passport and noted that it revealed the following travel schedule: entered Jamacia on July 21, 1979; entered Panama on July 22, 1979; entered Colombia on July 25, 1979; entered Panama on July 27, 1979; entered Jamaica on August 13, 1979.

* Hon. William J. Campbell, Senior Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

Dorsey was then referred to a separate room for a secondary search of his luggage. This search revealed only clothing and receipts for $2,700 in traveler's checks. The agent asked Dorsey to empty his pockets. Dorsey emptied all his pockets except his left shirt pocket. The agent then conducted a patdown search of Dorsey which revealed a cigarette package in the left shirt pocket. Further inspection of the cigarette package disclosed a plastic bag containing 58.5 grams of cocaine. A strip search was then performed which proved negative.[1]

Dorsey sought to suppress the cocaine found in his shirt pocket, arguing that the patdown search was made without a search warrant and without his consent nor was it made incident to a lawful arrest. He contended that his rights under the Fourth Amendment were thereby violated. The district court denied the motion to suppress, believing that the customs agent had an adequate basis of suspicion to conduct the search at issue.[2]

In this case we are confronted with defining the limits of a border search[3] and the justification necessary at each level of intrusion upon a traveler's privacy. To be sure, a routine inspection of a person and his belongings and effects at the border is exempt from the warrant provisions and the probable cause requirements of the Fourth Amendment. *Almeida-Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). However, defining what is properly considered a routine border search and determining whether an intrusion exceeds the bounds of such a search are more difficult questions.[4]

The Government primarily relies here on our decision in *United States v. Carter*, 592 F.2d 402 (7th Cir.), *cert. denied*, 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979). In *Carter* the defendant arrived at customs and passed through the initial customs check. Thereafter, he was taken to a secondary search room where the customs inspector asked the defendant to empty his pockets, which he did. The customs inspector then asked the defendant to remove his overcoat and suitcoat. The defendant complied and the customs inspector examined the suitcoat and found a package containing heroin. After finding the heroin the

---

1. Dorsey does not challenge the legality of the strip search.

2. The district court believed that a standard of "mere suspicion" governed a patdown search and concluded that the only suspicious factor present was "the trip to countries which are known to be sources of cocaine and other drugs." Tr. at 4. In explaining its decision the district court explicitly rejected reliance on the traveler's check receipts or the short stays in the various countries. *Id.*

   Because these determinations by the district court were not findings of fact but rather went to ultimate legal determinations—the standard applicable to the search and the question whether that standard was met—we need not defer to these findings. Rather, we must determine the matter *de novo.* Indeed, the district court's rejection as a suspicious factor of the short stays in drug-source countries is in conflict with well-settled authority. *See, e. g., United States v. Klein*, 592 F.2d 909, 912 (5th Cir. 1979) and cases cited in note 14 *infra.*

3. There is no dispute that border search principles apply to a passenger arriving at O'Hare International Airport from a nonstop international flight. *United States v. Carter*, 592 F.2d 402, 404 (7th Cir.), *cert. denied*, 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979) (*citing*

*United States v. Brown*, 499 F.2d 829 (7th Cir.), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974)). For a general discussion of border searches, see Note, *From Bags to Body Cavities: The Law of Border Searches*, 74 Colum.L.Rev. 53 (1974); Comment, *Border Searches and the Fourth Amendment*, 77 Yale L.J. 1007 (1968).

4. For purposes of convenience we refer to all stops and searches at the border as "border searches." However, as our opinion makes clear there are major variations in the kinds of intrusions upon a traveler's person and privacy which take place in the course of border investigations. By a "routine border search" we mean the search of a traveler and his belongings at a border which may be performed even absent any suspicion. *See, e. g., United States v. Carter*, 592 F.2d 402, 404 (7th Cir. 1979). The search in the present case exceeded the scope of a routine border search. Therefore, as discussed below, *Carter* and similar cases are not controlling. Yet in analyzing the particular search at issue we believe that the principles that apply do so because the intrusion occurred at the border where the sovereign's power to police entry has an important bearing upon the analysis.

customs inspector conducted a strip search as well as a thorough search of the defendant's luggage. In one bag several cigarette cartons were found, which, upon further inspection, revealed heroin.

In commenting on the search we noted the "unique nature of a border search." 592 F.2d at 404. Further, we discussed, although not definitively, the proper scope of a routine border search which may be performed without any suspicion:

> [T]hose entering the country may be examined as to their "belongings and effects" without violating the Fourth Amendment. Belongings and effects have been held to include the contents of a person's purse, wallet or pockets.

592 F.2d at 404–05 (citations omitted). The Government, relying on this passage from *Carter*,[5] contends that the discovery of the cigarette package in Dorsey's shirt pocket after a patdown was a mere search of outer clothing and pockets and under *Carter* can be conducted even in the absence of any suspicion.

Dorsey attempts to distinguish *Carter*, contending that in the instant case a patdown search was conducted—a greater intrusion than the request to empty pockets or the examination of pockets in a coat that has been removed (as in *Carter*).

Examination of the rapidly changing case law in the area supports the distinction drawn by Dorsey. Courts which have analyzed the scope of customs or border searches have been careful to note the degrees of intrusion upon the traveler's privacy and to note the incremental changes in the degree of intrusion which may trigger greater Fourth Amendment protections.

**5.** In the alternative the Government argues that the level of suspicion present justified the patdown search. Brief for the United States at 7–8.

**6.** This caveat distinguishes the cases cited by Dorsey in his Citation of Additional Authority, per Circuit Rule 11, filed on the day of oral argument. *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752,

II

A.

Initially, it is important to state what the instant case does not involve. This case does not involve a strip search. Nor are we presented with a cavity search. Finally, we are not deciding what justification is required for a search and seizure following a *domestic* flight. *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).[6]

■ As a general principle, the scope of a search at the border and the attendant degree of objectively justifiable suspicion (or lack thereof) required to trigger such a search are directly related—that is, the stronger the suspicion of the investigating officer the greater the intrusion justified. Courts have recognized this direct relationship and couched the analysis in terms of balancing the level of suspicion against the level of indignity or intrusion. *United States v. Brown*, 499 F.2d 829, 833 (7th Cir. 1974).

The cases using this balancing approach can be properly viewed as covering a spectrum—with a cavity or strip search at one end and a search of luggage at the other. Courts generally agree that the former requires a certain quantum of suspicion while the latter requires no suspicion whatever. *Compare United States v. Rodriquez*, 592 F.2d 553, 556 (9th Cir. 1979) *with United States v. Carter*, 592 F.2d 402, 404–05 (7th Cir. 1979).

The instant case, involving a patdown search, falls somewhere between these two ends of the spectrum. The Government, of course, attempts to classify the patdown as part of a routine border search while Dorsey urges us to use the analysis adopted in strip search cases. We decline to adopt the

65 L.Ed.2d 890 (1980); *United States v. Hill*, 626 F.2d 492, 28 Crim.L.Rep. 2101 (5th Cir. Sept. 24, 1980); *United States v. Robinson*, 625 F.2d 1211 (5th Cir. Sept. 17, 1980). These cases involve vastly different problems incident to searches and seizures after domestic flights: particularly, consent to search, use of drug courier profiles, and what is an arrest for purposes of the Fourth Amendment.

approach of either party. Rather, we believe that the relevant cases require that an approach different from either extreme be adopted.

■ Dorsey's reliance on the strip search cases is misplaced. Courts which have evaluated a strip search at the border have uniformly required some degree of suspicion—often categorized as "reasonable suspicion" or "real suspicion." *United States v. Nieves*, 609 F.2d 642, 646 (2d Cir. 1979); *United States v. Rodriquez*, 592 F.2d 553, 556 (9th Cir. 1979); *United States v. Himmelwright*, 551 F.2d 991, 995 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).[7] We believe, however, that this "reasonable" or "real" level of suspicion is required because of the invasion of privacy and indignity involved in a strip search—as compared to a patdown search. But we see no reason to discuss in detail the indignity and invasion of privacy attendant to a strip search. Rather, we believe these indignities and invasions of privacy are self-evident and clearly transcend the corresponding affronts suffered by the subject of a patdown search. *United States v. Grayson*, 597 F.2d 1225, 1228 (9th Cir.), *cert. denied*, 444 U.S. 873, 100 S.Ct. 153, 62 L.Ed.2d 99, 875, 100 S.Ct. 157, 62 L.Ed.2d 102 (1979); *United States v. Rivera-Marquez*, 519 F.2d 1227, 1228 (9th Cir. 1975).

Our refusal to apply strip search principles to the present case is supported by other authority. In the process of analyz-ing the application of strip search principles courts have been required to define and delineate the boundaries of what constitutes such a search. Intrusions which fall short of a strip search do not require the application of standards of suspicion appropriate to such searches. Thus, a patdown search, which falls short of the intrusiveness associated with a strip search, is governed by principles different from those applicable to strip searches.

*United States v. Nieves*, 609 F.2d 642 (2d Cir. 1979) supports this conclusion. In *Nieves* the defendant was subjected to a patdown search and a search of the heels of his shoes. The court rejected the defendant's contention that reasonable or probable cause was required to justify the intrusion. The court reasoned that not every request to remove an article of clothing or to remove something from pockets will transform a search into a strip search, because the level of embarrassment and intrusion differ significantly from a strip search. *Id.* at 646. *See also United States v. Klein*, 592 F.2d 909, 912 (5th Cir. 1979) (relatively unobtrusive patdown search not equivalent to strip search); *United States v. Fitzgibbon*, 576 F.2d 279, 284 (10th Cir. 1978) (removal of boot not a strip search); *United States v. Chase*, 503 F.2d 571, 573–74 (9th Cir. 1974) (removal of boot not as intrusive as strip search); *United States v. Brown*, 499 F.2d 829, 833–34 (7th Cir. 1974) (lifting of skirt to knees not equivalent to a strip search).[8]

---

**7.** Various circuits have grappled with the distinction (if indeed it exists) between "reasonable suspicion" and "real suspicion." The Ninth Circuit has adopted the requirement of "real suspicion". *Rodriquez*, 592 F.2d at 556. The Fifth and Second Circuits have expressly refused to adopt a "real suspicion" standard and instead use "reasonable suspicion." *United States v. Klein*, 592 F.2d 909, 911 (5th Cir. 1979); *United States v. Asbury*, 586 F.2d 973, 976 (2d Cir. 1978). The First Circuit apparently uses the "reasonable suspicion" test. *United States v. Wardlaw*, 576 F.2d 932, 934 (1st Cir. 1978).

We leave to another day the evaluation of this distinction.

**8.** *United States v. Stornini*, 443 F.2d 833 (1st Cir. 1971), cited by the Government, is distinguishable. In *Stornini* customs agents random-ly selected the defendant for a secondary search. This search involved the visual inspection of the defendant's body after he lowered his trousers. During this search the defendant's overcoat fell off a chair. A customs agent picked up the overcoat and felt a package in the lining. Further inspection revealed that the package was cocaine. The court held that the search of the overcoat was proper and not tainted by the illegal search of the defendant's body.

Thus, *Stornini*, like our decision in *Carter*, did not involve a patdown search but rather a search of a coat which had been taken off by the defendant. Also, the court in *Stornini* indicated that further intrusions, such as the body search conducted, could not be done on a "random basis." 443 F.2d at 835.

We therefore conclude that the strip search principles requiring "reasonable" or "real" suspicion are inapplicable to the present case.[9]

### B.

Our conclusion that strip search principles are inapplicable does not lead us to conclude that the instant type of intrusion may be performed without any degree of suspicion. The *Carter* case relied upon by the Government, as well as similar decisions, did not involve patdown searches. Instead, they involved a request to remove an outer garment and subsequent searches of pockets and thus properly were performed absent even minimal suspicion. Likewise, we do not think that those cases which allow the search of personal effects and belongings— contents of pockets, wallets, etc.—govern a patdown search. We believe that the intrusions on privacy and indignities involved in a patdown search exceed those of a search of the contents of a purse or wallet or of a request to empty pockets. *See United States v. Grayson*, 597 F.2d 1225, 1228 (9th Cir. 1979); *United States v. Klein*, 592 F.2d 909, 912 (5th Cir. 1979); *Henderson v. United States*, 390 F.2d 805, 808 (9th Cir. 1967).

Arguably, the distinction between a request to search or empty pockets and a patdown search is chimerical. To be sure, at first glance, the apparent difference in indignity and invasion of privacy may be minimal. However, while the difference may be difficult to articulate, it is real to those who are subject to the search in question. But we acknowledge that a statement of general principles governing the justification for patdown searches is difficult to propose.

> Between a search of pockets and a strip search there can be a variety of types of intrusion, with varying degrees of intrusiveness.... It is hardly feasible to enunciate a clear, and simple standard for each....

*United States v. Grayson*, 597 F.2d 1225, 1228 (9th Cir. 1979) (*citing United States v. Palmer*, 575 F.2d 721, 723 (9th Cir. 1978)). However, other circuits have been sensitive to these distinctions and require a degree of suspicion to justify a patdown search.

The Ninth Circuit, in analyzing patdown searches, has required a certain level of suspicion—described as "mere suspicion." *Grayson*, 597 F.2d at 1228.[10] This is in recognition of the fact that the intrusiveness of a patdown search exceeds that of a routine border search. In *Grayson*, the Ninth Circuit stated:

> Although ... we said that no suspicion was required to examine the contents of pockets we stated that "mere suspicion" was necessary for a patdown at a border.

*Grayson*, 597 F.2d at 1228 (*citing United States v. Carter*, 563 F.2d 1360, 1361 (9th Cir. 1977)). The Fifth Circuit also has required some level of suspicion in patdown searches. *United States v. Klein*, 592 F.2d 909, 912 (5th Cir. 1979) (using flexible test of reasonable suspicion). We agree with the Ninth and Fifth Circuits that a patdown requires some level of suspicion.

While we agree with the Ninth and Fifth Circuits that some suspicion is required to conduct a patdown search at the border, we decline to emulate the attempts of the Ninth and Fifth Circuits to label the degree of suspicion required for a patdown search. In *Grayson*, the Ninth Circuit denominated the requisite level of suspicion as "mere suspicion." 597 F.2d at 1228. The Fifth Circuit in *Klein* used a flexible test of "reasonable suspicion." 592 F.2d at 912. We believe that any attempt to label the required level of suspicion would not be helpful in resolving disputes involving the diverse circumstances of border searches. Each case requires an inquiry into the level of suspicion and the scope of intrusion presented. Hence, we believe that the bal-

---

**9.** The Ninth Circuit requires an even greater level of suspicion—"clear indication"—for a cavity search. *United States v. Rodriquez*, 592 F.2d 553, 556 (9th Cir. 1979). Of course, as we note above, the present case involves neither a strip search nor a cavity search.

**10.** The district court, without citing *Grayson*, held that mere suspicion was the appropriate standard.

ancing test set forth in our decision in *United States v. Brown*, 499 F.2d 829, 833 (7th Cir. 1974), is the appropriate mode of analysis.

> What is required to be balanced in any particular case is the level of suspicion of the agent against the level of indignity perpetrated upon the traveler.

*Id.* at 833.[11]

By rejecting any attempt at labelling the requisite level of suspicion we do not reject the principles embodied in the decisions of the Fifth and Ninth Circuits. Indeed, the balancing process we adopt is fully consistent with the analysis used by those courts in resolving border search cases.

### C.

Although we believe that in the instant case a patdown search was justified, our generalized holding that some level of suspicion is required for such a search resists formulation of a rule readily applicable to specific cases. Rather, a case-by-case method is the only means of establishing the contours of the principle.

But we may hazard some generalizations. The suspicion justifying a patdown search, like that required for a strip search, must be based on objective factors and judged in light of the experience of the customs agents. Also, in assessing these objective factors the factors relevant in strip search cases apply equally to the propriety of a patdown search.[12]

Several factors in the present case justify the patdown search and the eventual discovery of the cocaine in the cigarette package.[13] First, Dorsey's travel schedule indicated that he had traveled to countries known as sources of cocaine. *United States v. Nieves*, 609 F.2d 642, 646 n.6 (2d Cir. 1979). Second, Dorsey's stays in these countries were short.[14] Finally, Dorsey's failure to empty the contents of his left shirt pocket after a request to do so was

---

**11.** The Fifth Circuit's analysis most closely tracks that set out in our decision in *Brown*. In *United States v. Himmelwright*, 551 F.2d 991 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977), in the context of the lawfulness of the strip search, the court stated:

> All that this means is that "reasonableness" in the fourth amendment sense always depends upon a balance which must be struck between, on the one hand, the level of official intrusion into individual privacy and, on the other hand, the public interest to be served by such an intrusion.

*Id.* at 994. *Himmelwright* was cited with approval in the Fifth Circuit's decision in *Klein*. 592 F.2d at 911. The Fifth Circuit, unlike the Ninth, uses only a single standard of "reasonable suspicion" to analyze border searches. This standard embodies the balancing test set forth in *Himmelwright*.

**12.** A convenient cataloging of these factors appears in *United States v. Asbury*, 586 F.2d 973, 976–77 (2d Cir. 1978). They include nervous or unusual conduct, tips from informants, loose clothing, travel itinerary, lack of employment, needle marks, information from traveling companions, inadequate luggage, and evasive or contradictory answers. This list is intended to be illustrative rather than exhaustive of factors which may be relevant.

In a recent decision the Supreme Court discussed the presence of objective factors judged in light of the agents' experience. *United States v. Cortez*, —— U.S. ——, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). In *Cortez* the issue was the propriety of a stop of a pickup truck near the border. The Court upheld the stop because of the existence of various objective factors which, judged in light of the agents' experience, allowed the agents to reasonably conclude that the vehicle was involved in criminal activity. We note that *Cortez* differs from the present case, in that *Cortez* involved a stop rather than a search and did not discuss the appropriate level of suspicion required for various border searches. —— U.S. at ——, 101 S.Ct. at 695. However, the Court's reliance on objective factors judged in light of the agents' experience is fully consistent with our analysis and result in the instant case.

**13.** Once there was enough suspicion to conduct a patdown search and a search of Dorsey's pocket, the search of the cigarette package likewise was proper.

**14.** Short stays in countries which are known drug sources universally has been acknowledged as a factor arousing suspicion. *United States v. Klein*, 592 F.2d 909, 912 (5th Cir. 1979); *United States v. Himmelwright*, 551 F.2d 991, 996 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977); *United States v. Kallevig*, 534 F.2d 411, 414 (1st Cir. 1976).

We believe that the various factors present must be analyzed as a whole and that a particular factor—a short stay in a drug-source country—cannot be isolated. *Himmelwright*, 551 F.2d at 996 n.13. Of course, certain factors

suspicious.[15] Dorsey does not dispute that the contents of the pockets may be searched.[16] After he emptied all pockets but the one, the agents could have reasonably suspected that Dorsey chose to hide something.[17] This cause for suspicion, in conjunction with the peculiarities of Dorsey's itinerary, was sufficient to justify the patdown search. We regard this as a common sense result, which appropriately matches a degree of suspicion against the intrusive aspects of a patdown search.

Hence, the judgment of the district court is AFFIRMED.

present may weigh heavier in the balance than do others and any attempt to state with certainty which or how many factors must be present would be fruitless, as well as upsetting to the delicate balancing that must be done in each case.

The district court concluded that Dorsey's travel itinerary to drug-source countries was the sole factor that could have given the agent any suspicion to justify the patdown search. The district court rejected reliance on the short stays or the traveler's check receipts. We agree with the district court that the presence of $2,700 in traveler's check receipts, in the context of this case involving a three and one-half week vacation, is not suspicious. But we disagree with the district court's refusal to consider as suspicious the length of Dorsey's visits in the various countries. The cases cited *supra* indicate that short stays are an appropriate factor to be relied upon in assessing the propriety of a search.

Also, because we conclude that factors other than an itinerary including drug-source countries are present here, we need not discuss what level of intrusion, if any, is appropriate when that is the only factor present.

15. We do not hold that the failure to respond to a request to empty pockets would alone justify a patdown search or a search of the pocket in question in every case. Rather, as emphasized in note 14 *supra*, a particular factor must be viewed in light of all the circumstances present. *United States v. Wardlaw*, 576 F.2d 932, 934 (1st Cir. 1978).

Relying on the *Carter* decision and the right to search contents of pockets, it might be argued, that because there is a right to search the contents of pockets, if the traveler refuses to empty the pocket the agent can reach into it. Under the circumstances of this case such an argument is unavailing. The discovery of the cigarette package and cocaine was the result of the patdown search and did not result from a less intrusive reaching into Dorsey's pocket.

As discussed above we need not decide whether failure to empty pockets gives rise to enough suspicion to justify a patdown or search of the pocket or if some questioning must precede a decision to search a pocket not emptied after a request.

16. There is some confusion in the record about whether the customs agent was aware of Dorsey's failure to empty his left shirt pocket before he conducted the patdown search. Of course, if the agent was unaware of this failure he could hardly have relied upon such a factor in concluding that there was something suspicious about Dorsey. At oral argument counsel for the Government apparently contended that the agent was aware of this fact prior to the

17. See note 17 on page 1221.

search. The Government has contended likewise in its brief. Brief for the United States at 7. Dorsey has not controverted this fact and we believe that this is a fair reading of the Stipulation of Facts. R. at 9.

Our discussion of this factual dispute does not imply that either the same or a different result would be reached under other circumstances involving the shirt pocket, but rather