UNITED STATES of America,
Plaintiff–Appellee,

v.

Willa M. JOHNSON, Defendant–
Appellant.

No. 92–2254.

United States Court of Appeals,
Seventh Circuit.

Argued March 2, 1993.
Decided April 20, 1993.

Barry R. Elden, Asst. U.S. Atty., Office of the United States Attorney, Chicago, IL, Mark Hersh (argued), Chicago, IL, for plaintiff-appellee.

Robert W. Smith, Hillside, IL, Joseph M. Williams (argued), St. Charles, IL, for defendant-appellant.

Before RIPPLE, KANNE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.

Willa Johnson attempted to enter the United States with heroin concealed in a suitcase. A customs inspector discovered the heroin during a search of Ms. Johnson's luggage. After her arrest and subsequent

indictment, Ms. Johnson pleaded guilty to possessing with the intent to distribute approximately 1470.6 grams of heroin in violation of 21 U.S.C. § 841(a)(1), but preserved her right to appeal the district court's denial of her motion to suppress the heroin. *See* Fed.R.Crim.P. 11(a)(2). Because the district court properly denied Ms. Johnson's motion to suppress, we affirm the district court's judgment.

# I

## BACKGROUND

On May 14, 1991, Ms. Johnson arrived at O'Hare International Airport on a direct flight from the Philippines. Because she had declared over $400 in foreign purchases, she was referred to secondary customs for a calculation of the duty that she owed. She had in her possession four pieces of luggage: three soft-sided suitcases and one large, hard-sided suitcase.

Ms. Johnson proceeded to secondary customs where she encountered Inspector Larry Digiannantonio of the United States Customs Service. Inspector Digiannantonio asked Ms. Johnson some questions about her trip and learned that (i) Ms. Johnson had visited the Philippines; (ii) the purpose of her trip was to visit her grandparents; (iii) she had stayed with her grandparents; (iv) she had purchased $1000 worth of new clothes in the Philippines; and (v) she worked in the United States as a secretary at various hospitals, but she was unable to specify which hospitals. Ms. Johnson showed Inspector Digiannantonio her airline ticket and her passport. He observed that the passport had been newly issued the month before, that Ms. Johnson had paid for the ticket in cash on the day of her departure, and that her trip had lasted only five days.

Inspector Digiannantonio began to inspect Ms. Johnson's luggage. In her carry-on luggage, he found a receipt for a hotel in the Philippines. He questioned Ms. Johnson about her earlier statement that she had stayed with her grandparents, and she replied that although she had checked into a hotel, she still had stayed overnight with her grandparents. Inspector Digiannantonio next inspected the large, hard-sided suitcase, which appeared to be new. Ms. Johnson told him that she had purchased the suitcase in the Philippines. When Inspector Digiannantonio asked her how much she had paid for the suitcase, Ms. Johnson hesitantly replied that her grandparents had purchased the suitcase for her.

At Inspector Digiannantonio's request, Ms. Johnson opened the hard-sided suitcase. The contents consisted entirely of brand new clothes. Inspector Digiannantonio performed a "scratch test" on the top part of the suitcase by placing one hand on the outer shell, his other hand on the inner shell, and scratching the outer shell to create a vibration. The absence of a vibration would have been abnormal and would have suggested that there was contraband in the shell. The top part of the suitcase passed the scratch test. Next, Inspector Digiannantonio performed a "flex test" on the top part of Ms. Johnson's suitcase, using his hands to move the shell to test its flexibility. A lack of flexibility would have suggested the presence of contraband in the shell. The top part of Ms. Johnson's suitcase passed the flex test. Finally, Inspector Digiannantonio determined that the top of the suitcase was of normal weight, which suggested that there was no contraband hidden in the shell.

The bottom part of Ms. Johnson's suitcase, however, was suspicious. It was much heavier than the top part of the suitcase and it failed both the flex and scratch tests. Believing that the shell might contain contraband, Inspector Digiannantonio took the empty suitcase to an X-ray machine that was located a few feet away. The X-ray revealed a mass in the shell. Inside the mass could be seen outlines of what appeared to be small rectangular packages. Inspector Digiannantonio directed two customs agents to escort Ms. Johnson to a back room, which they did. He then took the suitcase into a tool room and removed the nylon cloth lining from the bottom part of the suitcase. He could see through a tiny hole in the shell that something was inside that was not the

same color as the suitcase. Suspecting that there was a false shell in the suitcase, he removed the shell, whereupon he smelled mothballs (but saw none) and found a package that was approximately three feet long, two feet wide, and one-quarter inch thick. Inside the package was white powder, which field-tested positive for heroin. Thereafter, inspectors strip-searched Ms. Johnson and recovered $900 in cash.

A federal grand jury returned a two-count indictment against Ms. Johnson. The only count relevant to this appeal is Count One, which charged Ms. Johnson with possessing with the intent to distribute approximately 1470.6 grams of heroin in violation of 21 U.S.C. § 841(a)(1). Ms. Johnson sought to suppress the heroin found during the search at the airport. She argued that both the search of her luggage and her detention ran afoul of the Fourth Amendment. After holding an evidentiary hearing, the district court denied Ms. Johnson's motion to suppress. Ms. Johnson subsequently entered a conditional plea of guilty, preserving her right to appeal the district court's denial of her motion. The district court sentenced Ms. Johnson to ten years in prison, to be followed by five years of supervised release. This appeal followed.

## II

### DISCUSSION

The issue presented by this appeal is whether the search of Ms. Johnson's luggage and her coterminous detention were "unreasonable" as that term is used in the Fourth Amendment.[1] The district court concluded that the search and detention constituted no more than a routine border inspection and, as such, were reasonable. The court also stated that, even if this procedure could not be considered routine, it did not contravene the Fourth Amendment because the customs inspectors had an adequate basis of suspicion to conduct the search and to detain Ms. Johnson be-

fore, during, and after the search. Accordingly, the district court denied Ms. Johnson's motion to suppress the heroin. A district court's denial of a motion to suppress evidence is reviewed deferentially because the district court had the opportunity to hear the testimony and observe the demeanor of the witnesses who testified at the hearing. *United States v. Edwards*, 898 F.2d 1273, 1276 (7th Cir.1990). We shall disturb the district court's denial of Ms. Johnson's motion to suppress the heroin only if the court committed clear error. *See United States v. Adebayo*, 985 F.2d 1333, 1340 (7th Cir.1993); *United States v. Spears*, 965 F.2d 262, 269 (7th Cir.), *cert. denied*, ___ U.S. ___, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992).

### A.

The search and detention in this case occurred at O'Hare International Airport, after Ms. Johnson arrived on a nonstop international flight. The airport therefore was functionally equivalent to an international border. *United States v. Dorsey*, 641 F.2d 1213, 1215 n. 3 (7th Cir. 1981); *United States v. Brown*, 499 F.2d 829, 832 (7th Cir.), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974); *see also Almeida–Sanchez v. United States*, 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973) ("[A] search of the passengers and cargo of an airplane arriving ... after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search." (footnote omitted)). That the search of Ms. Johnson's luggage took place at the border is significant because while the Fourth Amendment commands that all searches and seizures be reasonable, *as a general principle* searches and seizures made at the border "are reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977); *United States v. Thirty-seven Photographs*, 402 U.S. 363, 376, 91 S.Ct. 1400, 1408, 28 L.Ed.2d 822 (1971); *see also*

---

1. "The right of the people to be secure in their persons, houses, papers, and effects, against un-reasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV.

*Carroll v. United States,* 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925) ("Travellers may be ... stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.").

Customs officials have plenary authority to conduct *routine* searches and seizures at the border, even without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country. *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985); *see also* 19 U.S.C. § 1582 ("The Secretary of the Treasury may prescribe regulations for the search of persons and baggage[,] ... and all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under such regulations.").[2] Indeed, it is well established that a routine border search and seizure needs no articulable suspicion to justify it. *Montoya de Hernandez,* 473 U.S. at 538, 105 S.Ct. at 3309; *United States v. Ezeiruaku,* 936 F.2d 136, 140 (3d Cir.1991); *United States v. Braks,* 842 F.2d 509, 514 (1st Cir.1988); *United States v. Carter,* 592 F.2d 402, 404 (7th Cir.), *cert. denied,* 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979). A customs official may search a border entrant's luggage and outer clothing in a reasonable manner based on subjective suspicion alone, or even on a random basis, if the search and seizure may be characterized as routine. *Braks,* 842 F.2d at 514 (quoting *United States v. Stornini,* 443 F.2d 833, 835 (1st Cir.), *cert. denied,* 404 U.S. 861, 92 S.Ct. 162, 30 L.Ed.2d 104 (1971)).

When a border search and seizure becomes nonroutine, a customs official needs reasonable suspicion to justify it. *Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. at 3310–11; *Ezeiruaku,* 936 F.2d at 140; *Dorsey,* 641 F.2d at 1216. "Reasonable suspicion" is defined as " 'a particularized and objective basis for suspecting the particular person' " of smuggling contraband. *Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. at 3311 (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Therefore, the threshold question for this court centers on the character of the encounter between Ms. Johnson and the customs officials. If the search of Ms. Johnson's luggage and her coterminous detention were within the scope of what may be considered a routine border inspection, the search and detention were reasonable and did not run afoul of the Fourth Amendment. But if the inspection exceeded the scope of what may be considered routine, Ms. Johnson's Fourth Amendment right to be free from unreasonable searches and seizures was violated unless the customs officials reasonably suspected that Ms. Johnson was smuggling contraband into the country.

In determining whether an inspection made at the border was routine, courts have focused on the degree of intrusion into a border entrant's legitimate expectations of privacy. *Braks,* 842 F.2d at 511–12. Routine border inspections are those that do not pose a serious invasion of privacy and that do not embarrass or offend the average traveler. *Dorsey,* 641 F.2d at 1216. A search at the border of a traveler's luggage and personal effects is routine.[3] The search of a border entrant's suitcase, purse, wallet, and overcoat simply

---

**2.** The applicable Customs Regulation provides that "[a]ll persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a Customs officer." 19 C.F.R. § 162.6 (1990).

**3.** *See Thirty-seven Photographs,* 402 U.S. at 376, 91 S.Ct. at 1408; *Ezeiruaku,* 936 F.2d at 140–41; *United States v. 1903 Obscene Magazines,* 907 F.2d 1338, 1341 (2d Cir.), *cert. denied,* 498 U.S.

984, 111 S.Ct. 518, 112 L.Ed.2d 529 (1990); *United States v. Garcia,* 905 F.2d 557, 559–60 (1st Cir.), *cert. denied,* 498 U.S. 986, 111 S.Ct. 522, 112 L.Ed.2d 533 (1990); *United States v. Vega-Barvo,* 729 F.2d 1341, 1345 (11th Cir.), *cert. denied,* 469 U.S. 1088, 105 S.Ct. 597, 83 L.Ed.2d 706 (1984); *United States v. Quintero-Castro,* 705 F.2d 1099, 1100 (9th Cir.1983); *Carter,* 592 F.2d at 404–05.

is not sufficiently intrusive to be considered nonroutine. *See Quintero–Castro,* 705 F.2d at 1100. By contrast, a body cavity or strip search of the border entrant himself is significantly more intrusive and most certainly is *non* routine. *See United States v. Uricoechea–Casallas,* 946 F.2d 162, 166 (1st Cir.1991); *Dorsey,* 641 F.2d at 1216; *see also Montoya de Hernandez,* 473 U.S. at 540, 105 S.Ct. at 3310; (sixteen-hour detention of traveler suspected of smuggling narcotics in her alimentary canal was nonroutine border search). The degree of intrusion must be "reasonably related in scope to the circumstances which justified it initially." *Montoya de Hernandez,* 473 U.S. at 542, 105 S.Ct. at 3311. Furthermore, "[a]uthorities must be allowed 'to graduate their response to the demands of any particular situation.'" *Id.* (quoting *United States v. Place,* 462 U.S. 696, 709 n. 10, 103 S.Ct. 2637, 2646 n. 10, 77 L.Ed.2d 110 (1983)).

### B.

Ms. Johnson disputes the district court's determination that she was subject to a routine border inspection and not something more intrusive. She submits that the actions of Inspector Digiannantonio and the other officials who led her through customs at O'Hare International Airport exceeded the limits of a routine border inspection. But application of the above precepts to the facts of this case lead us to conclude that the district court did not commit clear error in finding that Ms. Johnson was subject to no more than a routine border inspection.

### 1.

■ Ms. Johnson devotes a good portion of her brief to the argument that her detention by Inspector Digiannantonio prior to the search of her suitcase ran afoul of the Fourth Amendment because it was not supported by articulable suspicion. She contends that, to justify detaining her, Inspector Digiannantonio first had to suspect reasonably that Ms. Johnson was smuggling contraband into the country and, based on what he knew when he detained her (that

Ms. Johnson worked in the United States as a secretary at unspecified hospitals, that she had returned from the Philippines after a five-day pleasure trip, that she had purchased her ticket in cash on the date of her departure, and that she had declared $1000 in foreign purchases), he lacked this requisite level of suspicion. In short, Ms. Johnson maintains that, even before he saw the suitcase in which he ultimately found the heroin, Inspector Digiannantonio detained her because he was convinced that she was smuggling contraband into the country. The district court concluded that Ms. Johnson's detention was part of the routine border inspection. We agree. Indeed, Ms. Johnson's emphasis on her detention obscures the true issue in this case, whether the search of her luggage was reasonable. We now turn to that issue.

### 2.

■ Inspector Digiannantonio's search of Ms. Johnson's suitcase was minimally intrusive and was well within the scope of what is considered routine. Inspector Digiannantonio first removed the contents of Ms. Johnson's suitcase. A customs official might have to rummage though any border entrant's luggage to ascertain whether all items have been declared properly. Such a minimal intrusion is a routine task. Removing the contents of a border entrant's luggage is only slightly more invasive and must also be considered routine.

Inspector Digiannantonio's next step was to execute the "scratch test," "flex test," and "weight test" on the top and bottom parts of Ms. Johnson's suitcase. These procedures also were minimally intrusive. They required only a few minutes of Ms. Johnson's time, did not harm the suitcase, and involved no harm or indignity to Ms. Johnson. Indeed, these tests were so unobtrusive that Ms. Johnson did not notice that Inspector Digiannantonio was performing them, even though she was standing only a few feet away. Moreover, Inspector Digiannantonio had the obligation as an agent of the United States Customs Service to make sure that Ms. Johnson was not smuggling contraband into the country. He tes-

tified that he performs all three tests on the luggage of all border entrants in order to meet that obligation.[4] These three tests, which are nothing more than a visual and manual determination that the luggage of border entrants carries no contraband, are within the scope of a routine border inspection.

■ After Ms. Johnson's suitcase had failed the scratch, flex, and weight tests, Inspector Digiannantonio subjected the suitcase to an X-ray examination. Again, this procedure took only a few minutes and was minimally intrusive, causing no harm to the suitcase and no embarrassment or indignity to Ms. Johnson. No doubt thousands of airport users subject their luggage to the same procedure each day; the machine that was used to X-ray Ms. Johnson's suitcase was the type that is used in airports across the country. Ms. Johnson could not have reasonably expected that her suitcase would pass through customs without being subjected to an X-ray examination.

■ Moreover, even if the border search became nonroutine when Inspector Digiannantonio subjected Ms. Johnson's suitcase to an X-ray examination (a proposition that we believe lacks merit) Inspector Digiannantonio had an adequate quantum of suspicion to justify the X-ray examination. As we have already noted, in *Montoya de Hernandez*, the Supreme Court held that the detention of a traveler at the border, beyond the scope of a routine border inspection, must be justified by a "reasonable suspicion" that the traveler is smuggling contraband into the country. 473 U.S. at 541, 105 S.Ct. at 3310. Inspector Digiannantonio clearly had a "particularized and objective," *id.*, basis for suspecting that the shell of Ms. Johnson's suitcase concealed

contraband. The bottom part of Ms. Johnson's suitcase had failed the scratch test, the flex test, and the weight test, suggesting that there was a foreign object concealed in the shell of the suitcase. Inspector Digiannantonio was justified in taking steps to determine whether there was, indeed, a foreign object hidden inside the shell. Certainly, the X-ray examination conducted by Inspector Digiannantonio was a justifiable means of making that determination. Because the bottom part of Ms. Johnson's suitcase had displayed abnormal physical qualities, Inspector Digiannantonio had a strong basis for suspecting that the shell contained a foreign object; nevertheless, his next step was to subject the suitcase to an X-ray examination that intruded only slightly on Ms. Johnson's privacy. Certainly the minimal intrusion imposed by the X-ray examination was justified in light of Inspector Digiannantonio's strong suspicion that Ms. Johnson's suitcase concealed contraband.

■ After the X-ray of Ms. Johnson's suitcase revealed the presence of a foreign object in the suitcase's shell, Inspector Digiannantonio instructed two fellow customs inspectors to take Ms. Johnson to a nearby holding room while he took the suitcase to a tool room. There he removed the inner shell, which revealed a package that covered the bottom of the suitcase. This package was ultimately determined to contain heroin. Even if this search could no longer be characterized as routine when Inspector Digiannantonio took Ms. Johnson's suitcase to the tool room, an adequate degree of suspicion existed to justify a nonroutine search of the suitcase. Moreover, removal of the inner shell of her suitcase was justified on the basis of the newly acquired information. Ms. Johnson cannot argue

---

**4.** Ms. Johnson maintains that Inspector Digiannantonio's testimony that he performs the scratch test, flex test, and weight test on the luggage of every border entrant that he encounters is incredible given the volume of travelers coming through customs at O'Hare International Airport. Ms. Johnson contends that the implausibility of this testimony is strong evidence that Inspector Digiannantonio conducted a nonroutine search of her luggage. That Inspector Digiannantonio might not inspect every border

entrant's luggage in the same manner is not ground for characterizing as nonroutine the search of Ms. Johnson's luggage. We have already acknowledged that a customs official may conduct routine searches on a random basis and not run afoul of the Fourth Amendment. *See* *Braks,* 842 F.2d at 514 (quoting *United States v. Stornini,* 443 F.2d 833, 835 (1st Cir.), *cert. denied,* 404 U.S. 861, 92 S.Ct. 162, 30 L.Ed.2d 104 (1971)).

meritoriously that, once the X-ray examination revealed the presence of a foreign object in the shell of her suitcase, Inspector Digiannantonio was not justified in taking steps to determine whether the foreign object was contraband.

### 3.

 Likewise, there was an adequate basis for the customs officials to detain Ms. Johnson in a holding room while Inspector Digiannantonio conducted his search and completed a field test on the substance found in the shell of the suitcase. The detention of a border entrant must be reasonably related in scope to the circumstances justifying it. *Montoya de Hernandez*, 473 U.S. at 542, 105 S.Ct. at 3311. Detaining Ms. Johnson, while an intrusion on her liberty, was justified. She was escorted to a private holding room, away from other travelers who were proceeding through customs, where she waited for forty minutes before the results of the field test came back positive for heroin. Given Inspector Digiannantonio's strong and well-grounded suspicion that the foreign object in Ms. Johnson's suitcase was contraband, the scope of the detention was reasonable.

### Conclusion

The district court, in denying Ms. Johnson's motion to suppress the heroin that was found in her suitcase, committed no error. We therefore affirm the district court's judgment.

AFFIRMED.