**UNITED STATES of America,
Appellant,**

v.

**Vincent EZEIRUAKU.**

**No. 91–1051.**

United States Court of Appeals,
Third Circuit.

Argued May 20, 1991.

Decided June 20, 1991.

Rehearing and Rehearing In Banc
Denied July 22, 1991.

Christopher Doherty, Anne L. Sullivan, Regional Counsel of Customs, Boston, Mass. (Arthur John Kyriazis (argued), Steven Roy Goodman, Lansdowne, Pa., of counsel), for appellant.

Kyriazis and Associates, Philadelphia, Pa. (Michael M. Baylson, Walter S. Batty, Jr., Karl K. Lunkenheimer, John C. Dodds (argued), Office of the U.S. Atty., Philadelphia, Pa., of counsel) for appellee.

Before STAPLETON, SCIRICA and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The question for decision in this appeal by the United States is whether the fourth amendment "border search" exception to the requirement of probable cause, reasonable suspicion or a warrant applies to outgoing as well as to incoming border searches of luggage. The district court determined that there was no justification for applying the border search exception to outgoing searches. We disagree, and for the reasons that follow, will reverse.

## I.

Jurisdiction was proper in the trial court based on 18 U.S.C. § 3231. We have jurisdiction under 18 U.S.C. § 3731. The appeal was timely filed under Rule 4(b), F.R.A.P.

## II.

On April 18, 1990, a team of U.S. Customs inspectors conducted operations at the Philadelphia International Airport. The team—consisting of Inspectors Sammaciccia, Taylor and Williams—was an Exodus team responsible for examining outbound shipments from the United States for currency, high technology items, munitions, stolen vehicles and other forms of contraband.

The inspectors targeted Lufthansa Flight # 415 to Frankfurt, Germany for what was called a "buck stop" operation. The main focus of this operation was to uncover large amounts of unreported currency leaving the United States, but the inspectors were also looking for prohibited munitions and high technology items. They selected the Lufthansa flight because Frankfurt has air connections to many high-risk areas for currency exportation, including Lagos, Nigeria, Lebanon and Pakistan, which are specifically associated with heroin trafficking.

To facilitate their selection of passengers who might present a suspicious profile, the inspectors obtained a list of passengers with connections out of Frankfurt. The inspectors then chose four persons for further review—two persons going on to Lagos, Nigeria, one going on to Zurich, Switzerland, and Vincent Ezeiruaku, who was ticketed to Brussels.

Inspector Sammaciccia testified that he saw an expensively dressed man and a female at the Lufthansa counter. At the man's feet were two very large brown suitcases, a suit bag and a briefcase. The man appeared to be paying the Lufthansa representative in cash. Inspector Sammaciccia stated that, based on past experience, travelers usually pay for tickets with credit cards and that he viewed passengers who pay with cash to be "highly suspect." Sammaciccia subsequently spoke to the Lufthansa representative, who advised him that although the man's ticket had not been paid for with cash, he had used the cash to pay for the overweight charges on his bags. The Lufthansa representative identified the man as Ezeiruaku.

While Sammaciccia was speaking to the Lufthansa representative, Inspector Taylor noticed that the woman with Ezeiruaku

was acting overly concerned with that conversation, and looking nervously at Inspectors Sammaciccia and Taylor. Inspector Taylor reported the woman's actions to Sammaciccia. At that point, Inspectors Day, Benedetti, Spade and Hughes and Special Agent Solon Chamberlain went to question the people they had selected from the Lufthansa connection list.

In the security area for outbound international flights, Ezeiruaku approached Inspector Sammaciccia and asked him for the location of a drinking fountain. Inspector Sammaciccia determined that Ezeiruaku's accent was Nigerian. Inspector Day, who had 19 years of Customs experience, joined the outbound inspectors. After reviewing the list of passengers with connections out of Frankfurt, Day focused on another individual going to Nigeria, two persons going to Zurich and Ezeiruaku. Inspector Sammaciccia told Day that Ezeiruaku had paid cash for overweight luggage, and Taylor recounted that Ezeiruaku's female companion had shown an "abnormal interest in the Customs in the area." Because Ezeiruaku's name appeared twice on the connection list, Inspector Day thought that the female companion was also a passenger. From intelligence reports, lookouts and records of seizures and arrests in other ports, Day knew that Nigerians were at risk for taking money and merchandise, including high technology goods and other merchandise requiring an export license, out of the United States.

At that point, Inspectors Day and Taylor went to inspect the checked luggage that was being placed in containers to be loaded on the plane. Day intended to look first at Ezeiruaku's bags and then at the bags of others on the flight. He found Ezeiruaku's bags outside the building, ready to be loaded on the plane. The inspectors then searched the bags. In one of the bags, they found documents relating to the shipping of cars to Nigeria. In the other bag, Inspector Day found $265,000 in cash, contained in $2,000 packs of $20 bills separately wrapped in carbon paper, and all wrapped in a rubber bath mat.

The officers conducted the search in an area not visible from the terminal. Day testified that bags usually are chosen for inspection based on factors such as size and destination. He gave several reasons for deciding to search Ezeiruaku's bags—his destination, that he paid cash at the ticket counter and that the female companion was "very nervous and had excessive interest in the Customs officers." Day said also that based his decision was based on previous seizures, computer information and his own experience. He was aware of previous cases of seizures from both Nigerian nationals and United States citizens of Nigerian descent on outbound flights.

While Inspectors Day and Taylor were inspecting checked luggage, a Lufthansa representative announced over the loudspeaker that anyone transporting more than $10,000 in currency out of the country had to file a Customs form. Posters including that information were displayed at several spots in the security area.

Inspector Sammaciccia spoke with Ezeiruaku, who acknowledged that he had heard the currency announcement but denied having over $10,000 on him or in his checked luggage. He said that he owned a gas station and was going to Brussels on business. Sammaciccia considered it odd that a gas station owner would go to Brussels on business and asked Ezeiruaku why. Ezeiruaku answered that he exported and imported beauty products and shrimp, and consented to a search of his hand-carried briefcase. Looking for currency and export permits related to Ezeiruaku's claimed business, Sammaciccia found a "large wad of American money" banded and folded over. To avoid putting Ezeiruaku in danger by examining him in front of the other passengers, Sammaciccia asked him to go to a nearby room used by security personnel on their breaks. Ezeiruaku had approximately $2,000 in $20 bills in the briefcase.

Continuing his examination of the briefcase, Sammaciccia found documents indicating shipments to Nigeria. Ezeiruaku told Sammaciccia that he was born in Nigeria but was now a naturalized U.S. citizen.

Sammaciccia then received a radio call from Inspector Day, who asked him to go to the checked luggage area, where Sammaciccia saw at least $20,000 of what was later determined to be $265,000 in cash. Inspector Day had begun his search at approximately 3:40 p.m., and had radioed Sammaciccia at approximately 3:55 p.m., about five minutes after Sammaciccia had first spoken to Ezeiruaku in the boarding line. After viewing the money in the checked luggage and verifying that the bags were Ezeiruaku's, Sammaciccia returned to the break room, conferred with Special Agent Chamberlain and advised the airline and Ezeiruaku that he would not be making the flight.

After the inspectors found the cash, they placed Ezeiruaku under arrest. They gave him *Miranda* warnings on more than one occasion. After saying that he wanted to think about whether he would talk with Agent Chamberlain, Ezeiruaku asked to speak with Special Agent Rovello. He was readvised of his rights, and he initialed and signed a document to that effect.

### III.

A federal grand jury subsequently indicted Ezeiruaku, charging him with one count of exporting unreported currency, in violation of 31 U.S.C. § 5316(a)(1)(A). After a series of unopposed continuances and two changes of defense counsel, the case was scheduled for trial on Monday, October 1, 1990. On Friday, September 28, 1990, Ezeiruaku filed a motion to suppress the cash seized at the airport. The Government filed a response later that same day. On Monday, October 1, 1990, the district court held an evidentiary hearing on the motion, and issued a bench opinion granting the motion. It also granted the Government's request to stay the proceedings for an appeal.

On October 19, 1990, the Government filed a motion for reconsideration. On December 19, 1990, the district court filed a written opinion upholding its previous decision. The court concluded that before the Customs officials could lawfully search Ezeiruaku's bags, they needed "reasonable suspicion" that he was engaged in conduct in violation of the currency reporting laws and that this standard had not been met in this case. *United States v. Ezeiruaku,* 754 F.Supp. 420, 441 (E.D.Pa.1990). The court also determined that the search of Ezeiruaku's checked baggage was non-routine and that even if the border exception applied, the offensive nature of the search violated the fourth amendment. *Id.* at 442. Concluding that the search was unlawful, the district court ordered the suppression of the evidence and dismissal of the indictment. *Id.*

### IV.

We enjoy plenary review of a dismissal of an indictment, because the decision to dismiss is one of law. *United States v. Garcia,* 919 F.2d 881, 885 (3d Cir.1990). On review, the trial court's findings of narrative or historical facts are measured by the clearly erroneous test, but as to the legal component of its conclusion, we have plenary review. *United States v. Felton,* 753 F.2d 276, 278 (3d Cir.1985).

### V.

The authority for the search of the checked baggage in this case was premised on the 1986 amendment to 31 U.S.C. § 5317(b), which provides:

> For purposes of ensuring compliance with the requirements of section 5316 [the currency reporting statute], a customs officer may stop and search, at the border and without a search warrant, any vehicle, vessel, aircraft, or other conveyance, any envelope or other container, and any person entering or departing from the United States.

The 1986 amendment eliminated "reasonable cause" language from the statute. Prior to its amendment, section 5317 authorized the Secretary of the Treasury to apply for a search warrant when the Secretary had reasonable cause to believe section 5316 had been violated.

There is no dispute that the search in this case occurred at the functional equivalent of the border. *Almeida–Sanchez v. Unit-*

*ed States,* 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973) (international airports are functional equivalent to border); *United States v. Caminos,* 770 F.2d 361, 364–65 (3d Cir.1985). In this case, however, the district court reasoned that if fourth amendment protections do not apply at the border, "any conduct directed by the government, regardless of how arbitrary, oppressive or unreasonable, will pass constitutional muster." *United States v. Ezeiruaku,* 754 F.Supp. 420, 426 (E.D.Pa. 1990).

On appeal, the Government does not contend that the fourth amendment is inapplicable at national borders, or that the actions of government agents at the borders are immune from constitutional scrutiny. Rather, the Government contends that the well-recognized "border exception" to the fourth amendment supports the search of Ezeiruaku's luggage and that 31 U.S.C. § 5317(b) codifies this established search authority.

■ Under the "border exception" doctrine, customs officials may conduct routine searches of persons and effects crossing the border even in the absence of individualized suspicion. The border search exception to the fourth amendment warrant requirement is not new. In *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), the Court noted that the same Congress which originally proposed adoption of the fourth amendment also passed a customs statute allowing warrantless searches on the national borders:

> As this act was passed by the same congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as "unreasonable," and they are not embraced within the prohibition of the amendment.

*Id.* at 623–24 (citations omitted).

The Supreme Court consistently has held that searches of persons and items entering the borders of the United States are constitutional without a warrant, probable cause or reasonable suspicion. *See United States v. Montoya de Hernandez,* 473 U.S.

531, 537–38, 105 S.Ct. 3304, 3308–09, 87 L.Ed.2d 381 (1985); *United States v. Ramsey,* 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977); *Carroll v. United States,* 267 U.S. 132, 153–54, 45 S.Ct. 280, 285–26, 69 L.Ed. 543 (1925).

Noting that a long line of cases has followed *Boyd,* we have stated that "it is well established that searches of persons or property at the border are considered reasonable within the meaning of the Fourth Amendment simply by virtue of the fact that they occur at the border." *United States v. Glasser,* 750 F.2d 1197, 1201 (3d Cir.1984), *cert. denied,* 471 U.S. 1018, 1068, 85 L.Ed.2d 306, 504 (1985). In *United States v. Ramsey,* the Supreme Court repeated that

> [t]here has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless 'reasonable' has a history as old as the Fourth Amendment itself.

431 U.S. at 619, 97 S.Ct. at 1980 (footnote omitted).

### VI.

■ In applying the foregoing precepts to the case at bar, we begin our discussion by emphasizing that there is a distinction between a routine and non-routine search at a border. An incoming routine search at the border needs no articulable suspicion to justify it; a non-routine search triggers the requirement of reasonable suspicion. *See United States v. Turner,* 639 F.Supp. 982, 986–87 (E.D.N.Y.1986). The issue we must confront here is whether this search was routine, and if so, what standard should apply to an outgoing search.

■ Courts, including ours, have held consistently that the border search of luggage is "routine" and requires no degree of suspicion. *See, e.g., United States v. Scheer,* 600 F.2d 5 (3d Cir.1979) (per curiam); *see also United States v. Benevento,* 836 F.2d 60, 68 (2d Cir.1987) (search of

luggage checked from New York to Geneva), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988); *United States v. Vega–Barvo,* 729 F.2d 1341, 1345 (11th Cir.) (no articulable suspicion required for border search of luggage), *cert. denied,* 469 U.S. 1088, 105 S.Ct. 597, 83 L.Ed.2d 706 (1984); *United States v. Udofot,* 711 F.2d 831, 839–40 (8th Cir.) (luggage checked from Minneapolis to Nigeria), *cert. denied,* 464 U.S. 896, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983); *United States v. Swarovski,* 592 F.2d 131, 133 (2d Cir.1979) (border search of luggage checked for outbound flight); *United States v. Asbury,* 586 F.2d 973, 975 (2d Cir.1978); *United States v. Bareno–Burgos,* 739 F.Supp. 772, 778 (E.D.N.Y.1990) (search of bag checked from New York through Miami to Colombia). Applying the foregoing precepts to the circumstances here, we have no difficulty in concluding that the customs officials performed a routine search of outbound luggage.

The district court's determination that the examination of the luggage was "nonroutine" flies in the face of the clear teachings of this court as well as the substantial foregoing authority. The district court's determination, therefore, was clear reversible error. Additionally, we conclude that the district court improperly limited the border search exception to outgoing searches.

### VII.

The search in this case occurred as Ezeiruaku was about to board an outbound international flight. The Government concedes that the Supreme Court has not directly addressed the applicability of the border search exception to persons and objects leaving the United States. However, it argues that in *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974), the Supreme Court stated in dicta that "those entering and leaving the country may be examined as to their belongings and effects, all without violating the Fourth Amendment." *Id.* at 63, 94 S.Ct. at 1518. It also relies on *Julian v. United States,* 463 U.S. 1308, 103 S.Ct.

3522, 77 L.Ed.2d 1290 (1983) in which then Justice Rehnquist reviewed an application for bail pending disposition of a petition for writ of certiorari. The applicant in *Julian* had been convicted based on the discovery of unreported currency when he and his luggage were searched as he was about to board an outbound flight to Peru. In denying the application for bail, Justice Rehnquist stated:

> Applicant also claims that the evidence taken from his person and his luggage was the fruit of unconstitutional searches and should have been suppressed. But see *United States v. Ramsey,* 431 U.S. 606, 616–619 [97 S.Ct. 1972, 1978–1980, 52 L.Ed.2d 617] (1977) (border searches require neither probable cause nor a warrant). Applicant's remaining contentions are even less substantial.

*Id.* 463 U.S. at 1310, 103 S.Ct. at 2524.

The Government notes that the courts of appeals for the eighth, fifth and second circuits have cited *California Bankers* and *Julian* as authority for deciding that routine outbound border searches fall within the border exception. *See United States v. Udofot,* 711 F.2d 831 (8th Cir.), *cert. denied,* 464 U.S. 896, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983); *United States v. Ajlouny,* 629 F.2d 830, 834 (2d Cir.1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981); *United States v. Swarovski,* 592 F.2d 131 (2d Cir.1978). Moreover, the Court of Appeals for the Eleventh Circuit stated in *United States v. Hernandez–Salazar,* 813 F.2d 1126 (11th Cir.1987) "[e]very circuit that has considered the question has ruled that the rationales for the 'border exception' apply both to incoming and outgoing persons and instrumentalities." *Id.* at 1137 (footnote and citations omitted).

*United States v. Stanley,* 545 F.2d 661 (9th Cir.1976), *cert. denied,* 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978), was the first reported decision applying the border search exception to outgoing searches. In *Stanley,* an outbound vessel nine miles from shore was searched by customs officials. In ruling that U.S. Customs officials could constitutionally conduct a border

search of a ship departing the United States, the court noted that the rationale for an inbound border search is equally applicable to searches of persons and objects leaving the country. The court reasoned that

> both incoming and outgoing border-crossing searches have several features in common: (1) the government is interested in protecting some interest of United States citizens, such as restriction of illicit international drug trade, (2) there is a likelihood of smuggling attempts at the border, (3) there is difficulty in detecting drug smuggling, (4) the individual is on notice that his privacy may be invaded when he crosses the border, and (5) he will be searched only because of his membership in a morally neutral class.

*Id.* at 667.

In the case before us, the district court ignored the weight of authority of every court of appeals that has considered the subject. It engaged in a convoluted analytical exercise to justify its conclusion that the incoming border search exception is not applicable to an outgoing search: It cited authority that did not apply to border searches. It relied on orthodox fourth amendment search doctrine and proceeded as if a border search exception did not exist. 754 F.Supp. at 436–37. In so doing, the court committed the logical fallacy of *dicto simpliciter* (fallacy of accident) which "occurs when a general rule is applied to exceptional circumstances." *See* R. Aldisert, *Logic for Lawyers: A Guide to Clear Legal Thinking* 190 (1989).

The district court concluded that the requirements of reasonable suspicion, probable cause or a warrant apply to searches of personal luggage notwithstanding the abundant language of the section 5317(b) and case law interpreting the constitution that specifically deals with this issue. *Id.* at 430–31. Of the various cases the court used to support its conclusion, none treated the border search exception to the traditional fourth amendment doctrine. *See, e.g. New Jersey v. T.L.O.*, 469 U.S. 325, 338–39, 105 S.Ct. 733, 741–42, 83 L.Ed.2d 720 (1985) (high school student had legit-

imate expectation of privacy in a purse carried at school); *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (luggage seized from man travelling from Miami to New York in a domestic flight); *Robbins v. California*, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981) (two wrapped packages seized from car), *overruled, U.S. v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) ("automobile exception" inapplicable to warrantless search of suitcase seized from taxi), *modified*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (search of footlocker removed from trunk of car); *United States v. Barry*, 853 F.2d 1479 (8th Cir.1988) (reasonable expectation of privacy in locked suitcase left at the Minneapolis–St. Paul Airport); *Hernandez v. United States*, 353 F.2d 624 (9th Cir. 1965) (upholding search of person travelling from Los Angeles to New York), *cert. denied*, 384 U.S. 1008, 86 S.Ct. 1972, 16 L.Ed.2d 1021 (1966); *United States v. Malachi*, 728 F.Supp. 777 (D.D.C.1989) (search of tote bag carried by inter-city bus traveler).

Each of these cases recognizes that people generally have a subjective expectation of privacy in their luggage, but the differentiating feature in the cases relied on by the district court from the case at bar is that none of them concern border searches, which "have a unique status in constitutional law." *United States v. Vega–Barvo*, 729 F.2d at 1344. All of these cases are thus readily distinguishable.

In a case basically on all fours with the one before us, the Court of Appeals for the Eleventh Circuit, in approving the search of checked luggage of a passenger about to board an outbound flight, recognized that

> [t]he governmental interest in stemming the flow of unreported currency out of the United States is substantial. Large amounts of undeclared currency departing the United States bear an obvious relationship to the "veritable national crisis in law enforcement" caused by smuggling of illicit narcotics and money laun-

dering schemes often associated with organized crime. The "long-standing right of the sovereign to protect itself" that underlies the traditional rationale for the border search exception is implicated to a substantial degree where the international borders of the United States are penetrated by large sums of undeclared currency departing this country.

*United States v. Hernandez–Salazar*, 813 F.2d at 1138 (footnotes omitted).

Similarly, Court of Appeals for the Fifth Circuit recently upheld an outbound border search for currency:

[g]iven the substantial national interest in regulating the exportation of domestic currency at the border and the similar features of incoming and outgoing border-crossing searches for fourth amendment purposes, we hold that in the context of a routine stop and search for currency, the rationale applied to border searches under the fourth amendment encompasses persons exiting as well as persons entering our borders.

*United States v. Berisha*, 925 F.2d 791, 795 (5th Cir.1991) 925 F.2d at 795 (footnote omitted); *see also United States v. Cardona*, 769 F.2d 625, 628 (9th Cir.1985); *United States v. Udofot*, 711 F.2d at 839–40; *United States v. Duncan*, 693 F.2d 971, 977 (9th Cir.1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983); *United States v. Ajlouny*, 629 F.2d at 833–34; *United States v. Swarovski*, 592 F.2d at 133; *United States v. Stanley*, 545 F.2d at 667. To be sure, a single panel of the Court of Appeals for the Ninth Circuit, by way of *obiter dictum*, has questioned the applicability of the border search exception to outgoing searches, but that court acquiesced to prior precedent that upheld that application. *United States v. Des Jardins*, 747 F.2d 499, 503–04 (1984), *vacated in part*, 772 F.2d 578 (9th Cir.1985). Significantly, no court of appeals that has considered the issue is in agreement with the result or the reasons articulated by the district court here.

■ Accordingly, we join the Second, Fifth, Eighth, Ninth and Eleventh Circuit Courts of Appeals in concluding that the traditional rationale for the border search exception applies as well in the outgoing border search context.

Because the luggage in this case was at the functional equivalent of the border, we hold that no warrant, reasonable suspicion or probable cause was needed to justify the search. National interests in the flow of currency justify the diminished recognition of privacy inherent in crossing into and out of the borders of the United States. We conclude, therefore, the district court erred in suppressing evidence of the currency found in Ezeiruaku's checked baggage and in dismissing the indictment against him.

This, too, must be said. Although there is not the slightest suggestion that the appellee here was implicated in drug trafficking, in an environment that sees a massive importation of drugs across our borders, we are cognizant that there must be a concomitant outflow of cash to pay for this nefarious traffic. Strong dictates of public policy reinforce the necessity of identifying, if not monitoring or controlling, a cash outflow from the country as well as an influx of narcotics into the country.

V.

■ A secondary issue is presented by a factual finding made by the district court which the Government has also appealed. The district court found as a fact that "[r]ace or nationality of origin was the determinative factor in Sammaciccia's decision to stop, question and detain Ezeiruaku as well as to conduct the search of Ezeiruaku's briefcase and checked luggage." 754 F.Supp. at 422 (Finding of Fact 24).

We are persuaded that the record does not support the district court's inclusion of the word "race" in this finding. The record is not only barren of supporting evidence; it contains uncontroverted testimony to the contrary. Sammaciccia testified that Ezeiruaku's name was selected from the Lufthansa passenger list because "it appeared to be a Nigerian name." App. at 13. There was no testimony that his name was selected because it appeared "African" or "black." The only two African countries given special focus by cus-

toms officials based on information they have gathered through intelligence operations are Nigeria and Ghana. *Id.* at 21. Inspector Sammaciccia testified specifically that race was not a factor in the search and that the focus was on the country to which, based on his Nigerian-sounding name, the inspectors believed Ezeiruaku was travelling. *Id.* at 19, 50–51, 128. Given this clear and uncontroverted testimony, we hold that the district court's finding that race was a determinative factor was clearly erroneous.

## VI.

The order of the district court suppressing the evidence and dismissing the indictment will be reversed.