696 So.2d 806 (1997)
STATE of Florida, Appellant,
v.
Joseph CODNER, Appellee.
No. 94-04137.
District Court of Appeal of Florida, Second District.
March 7, 1997.
*807 Robert A. Butterworth, Attorney General, Tallahassee, and Erica M. Raffel, Assistant Attorney General, Tampa, for Appellant.
No appearance for appellee.
PER CURIAM.
The state appeals an order suppressing both a lease agreement and nine pounds of cannabis, and an order dismissing the information against the appellee for possession of that cannabis. The pivotal issue is whether the lease seized from the appellee's wallet at *808 a routine border search was valid.[1] We hold that the scope of this border search and seizure which occurred at an international airport was not excessive and did not violate any Fourth Amendment rights of the appellee.
Most of the facts are undisputed. On November 3, 1993, the appellee attempted to board a flight for Jamaica at Tampa International Airport while carrying more than $10,000 in cash, without filing a report with the United States Customs Service (customs). The report is required by section 5316 of Title 31 of the United States Code which provides in pertinent part:
(a) ... [A] person ... shall file a report under subsection (b) of this section when the person, ... knowingly(1) ... is about to transport, ... monetary instruments of more than $10,000 at one time (A) from a place in the United States to or through a place outside the United States;...
When an inspector for customs asked him whether he was carrying more than $10,000, the appellee told her he had $8,000. She then asked him to empty his pockets and his bag, which revealed $11,033. Some of the money was found in envelopes labeled with different people's names, and some was found on his person and in his wallet.
Another inspector, Mullins, who was assisting in the counting of the currency found not only currency in the wallet but identification papers, a driver's license and a lease agreement for a mini-storage facility. A trained drug detecting dog alerted on the money while the inspectors counted it. The customs inspectors then turned the money and the wallet with its contents over to a special customs agent named Drewes.
Both inspectors testified that as each passenger entered the jetway for an international flight, the inspectors asked whether he or she was carrying more than $10,000 in monetary instruments or currency. Customs posted signs in the airport informing passengers exiting the country of the reporting requirement. Airport employees announced over the intercom while the passengers prepared to board flights leaving the United States that they are required to report over $10,000 in monetary instruments.
On discovering the violation, customs officials and a member of the Hillsborough County Sheriff's Office escorted the appellee to the nearby Federal Inspection Station (FIS) at the airport. The appellee was detained while being interviewed at the FIS by Special Agent Dalessandro. Detective Deleon of the Hillsborough County Sheriff's Office was the only other person present for the interview.
During the interview, after which the appellee had been read his Miranda[2] rights, he told them that he had been unemployed for over five years, had received a worker's compensation settlement of $39,000, and had kept the money in his residence as opposed to a financial institution. He told them he intended to spend the approximately $11,000 to build a residence in Jamaica. Inside the FIS, another dog trained for detecting drugs for customs alerted on one of the three to five envelopes lying on the floor there.
Dalessandro left the room during the interview at which point Drewes gave him the wallet containing the lease to the mini-storage facility. When Dalessandro returned to the room, he questioned the appellee about the lease. The appellee initially told him that he was a disc jockey at parties and kept equipment there. When asked whether he would consent to their looking inside the unit, the appellee became visibly upset and "leapt" out of his chair. He then denied his original story about being a disc jockey and further disclaimed any connection with the rental unit. After saying that nothing was in the storage unit, he changed his story back to the initial version stating that disc jockey equipment was in the unit.
*809 Although there was conflicting testimony as to whether Deleon received a photocopy of the lease from Dalessandro at the airport or from the manager of the storage facility at a later time, the judge believed that Deleon received a copy at the airport. Deleon's receipt of the lease at the airport is the "seizure" of which defense counsel complained to the trial court. Defense counsel successfully argued that it was at the moment the photocopied lease was delivered to Deleon that the permissive scope of the search was exceeded. In the trial court's words, the customs officers "exceeded the permissive scope of this warrantless stop by retrieving papers from the [appellee's] wallet, unfolding them, looking at them, photocopying them, and delivering the copies of the paperwork to members of the Hillsborough County Sheriff's Office." We disagree.
We must first determine whether the facts of this case fall into one of the many exceptions to the warrant requirement of the Fourth Amendment, particularly a border search. If the facts meet the prerequisites of a border search, we need determine only one last criteria: whether the search was routine versus nonroutine. If the search was routine, the search and seizure of the appellee's wallet at the airport did not exceed its rather broad and permissive scope.
A border search occurs either at a border or the functional equivalent of a border. An airport with incoming international flights has long been considered the functional equivalent of a border. Almeida-Sanchez v. United States, 413 U.S. 266, 274, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). The courts generally have always permitted warrantless searches for people entering the country. See United States v. Ramsey, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977) ("[t]hat searches made at a border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border"); United States v. Montoya de Hernandez, 473 U.S. 531, 539-540, 105 S.Ct. 3304, 3309-3310, 87 L.Ed.2d 381 (1985) (expectation of privacy less at border than in the interior and the balance between the interests of the government and the privacy right of the individual should favor the government). Various established tests do exist for evaluating the particular circumstances of the search to determine whether the search occurred at the functional equivalent of a border. See United States v. Hill, 939 F.2d 934, 938 (11th Cir.1991). We need not discuss these tests in this case, however, where the search and seizure transpired in its entirety at the airport and a nearby interview room, because the facts establish without a doubt that the appellee was searched at the functional equivalent of a border.
Whether an airport with departing international flights and hence, persons exiting the country, as in this case, also constitutes the functional equivalent of a border has never been answered directly by the United States Supreme Court. Dictum does exist, however, supportive of an affirmative conclusion. See California Bankers Ass'n v. Shultz, 416 U.S. 21, 63, 94 S.Ct. 1494, 1518, 39 L.Ed.2d 812 (1974) ("those entering and leaving the country may be examined as to their belongings and effects, all without violating the Fourth Amendment") (emphasis added). Several of the federal circuit courts have held that an airport with departing, as opposed to arriving, international flights meets the border requirement. See United States v. Oriakhi, 57 F.3d 1290, 1296 n. 3 (4th Cir.1995); United States v. Berisha, 925 F.2d 791, 794 n. 5 (5th Cir.1991).[3] As noted by the court in Oriakhi, 57 F.3d 1290, 1297:
The governmental interest in stemming the flow of unreported currency out of the United States is substantial.... The "long-standing right of the sovereign to protect itself" that underlies the traditional rationale for the border search exception is implicated to a substantial degree where the international borders of the United *810 States are penetrated by large sums of undeclared currency departing this country.
(quoting from United States v. Hernandez-Salazar, 813 F.2d 1126, 1138 (11th Cir.1987)).
Our case involves, as did Berisha, Oriakhi, and United States v. Ezeiruaku, 936 F.2d 136 (3d Cir.1991), a violation of the reporting requirement of currency and monetary instruments. As the Berisha and Ezeiruaku courts acknowledge, the 1986 amendment of section 5317(b) eliminated the "reasonable suspicion" standard for border searches based on a violation of section 5316. Berisha, 925 F.2d at 795; Ezeiruaku, 936 F.2d at 139. Section 5317(b) now provides:
Searches at border. For purposes of ensuring compliance with the requirements of section 5316, a customs officer may stop and search, at the border and without a search warrant, any vehicle, vessel, aircraft, or other conveyance, any envelope or other container, and any person entering or departing from the United States.[4]
(Emphasis added.) Thus, a person departing the country, as in this case, may be the subject of a border search for U.S. currency and monetary instruments without the necessity of reasonable cause.
We next briefly address whether the search and seizure of the appellee's wallet was routine or nonroutine. See Berisha, 925 F.2d at 793-794 (customs agents may make warrantless searches of people entering country without reasonable suspicion, provided search is routine). The Berisha court concluded that the initial detention of a person violating the reporting requirement including his accompaniment to "Secondary Customs" constituted a routine as opposed to a nonroutine border search. Berisha, 925 F.2d at 794. At least one court has specifically written that the search of a person's "suitcase, purse, wallet, and overcoat" at the border is "simply not sufficiently intrusive to be considered nonroutine." United States v. Johnson, 991 F.2d 1287, 1291 (7th Cir.1993).
In this case, all boarders on this international flight were questioned individually regarding the reporting requirement. Announcements over the loud speaker informed them of the reporting requirement. The appellee's person including his wallet were searched in accordance with routine procedure. We can conceive of no other more logical location to look for currency other than in someone's wallet. The fact that the wallet contained a rental agreement for a storage unit which was later found to be full of contraband does not violate any principles of a routine border search. Upon discovering his omission to report over $10,000 in currency which he was carrying on his person, a clear violation of section 5316, the customs inspectors properly detained the appellee and accompanied him to a separate room in the airport for further questioning.
As to the argument that the photocopying of the lease constituted an illegal seizure, we find it without merit. In United States v. Fortna, 796 F.2d 724, 738 (5th Cir.1986), the customs agent photocopied and retained copies of a map of northern Mexico with airstrips circled, a handwritten note saying "Pickup pilot in Miami," and two tickets to Bogota, Columbia. The court held that the photocopying of the contents of his luggage did not violate any rights of the passenger arriving in Dallas from Mexico City, because the initial inspection of the documents was proper.
That the photocopied rental agreement in this case landed in the hands of the Hillsborough County Sheriff's Office through Dalessandro is of no moment. See, e.g., Morales v. State, 407 So.2d 321, 329 (Fla. 3d DCA 1981); cf. State v. Edwards, 650 So.2d 630, 631 (Fla. 2d DCA 1994) (state not penalized for gratuitous receipt of medical records from private attorney). The state should not be hindered in its prosecution for acceptance of a copy of *811 a lease found in a wallet, an appropriate place to carry currency. Consequently, we hold that this search constituted a routine border search and did not exceed its broad scope.
Based on the conduct of the hearing and the possible confusion which arose in the context of searches at airports in general, we believe it necessary to emphasize that a search at an airport per se does not always implicate the border search exception. For example, if the person is about to board or deplane a domestic flight, the border search exception is inapplicable. See Mata v. State, 380 So.2d 1157 (Fla. 3d DCA), petition for review denied, 389 So.2d 1112 (Fla.1980) (although search resulting in seizure of cocaine occurred at Miami International Airport, passengers had neither entered nor intended to leave the country; all connecting flights and destinations were domestic). In that situation, another exception, if any, to the warrant requirement must be used to validate the search and seizure.
In Shapiro v. State, 390 So.2d 344 (Fla. 1980), cert. denied, 450 U.S. 982, 101 S.Ct. 1519, 67 L.Ed.2d 818 (1981), which was cited at the hearing, the facts do not indicate that the passenger was either leaving or entering the country. Shapiro entails a search of a potential hijacker at an airport, which search technically falls into a different category than a search at the border. Security searches enable airport personnel to search for weapons and explosives on a person who fits an airline hijacker's profile. Although the underlying reasoning for an airport security check is different from that of a border search, the airport security search performed under Shapiro has been held to be "akin to a border search." State v. Baez, 530 So.2d 405, 408 (Fla. 3d DCA 1988); State v. Campanponi, 424 So.2d 163, 166 (Fla. 3d DCA 1983); Morales, 407 So.2d at 327.
We further note that of the Florida cases on border searches, many do not involve border searches occurring at an airport. See, e.g., Morales, 407 So.2d at 328 (search of vessels off Florida coast had crossed into territorial waters of United States from the high seas).[5] To this extent, the relevant statute under which the search is being conducted may impose additional safeguards to provide some minimal protection of an individual's Fourth Amendment rights.
Because the initial search and photocopying of the lease found in the wallet was a valid routine border search, the subsequent search and seizure at the storage unit, which was conducted with a warrant, was proper. Hence, we must reverse both orders and remand the case for further proceedings.
Reversed and remanded.
SCHOONOVER, A.C.J., and LAZZARA and QUINCE, JJ., concur.
NOTES
[1] All parties to this case agree, as do we, that the subsequent search of the mini-storage unit, which was the subject of the lease and the location of the cannabis, is valid if the search at the airport did not exceed the scope of a routine border search.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] To extend the border search exception to exiting persons may depend on an analysis of the particular statute under which the search is being conducted and whether it contains a "reasonable suspicion" or "probable cause" requirement. United States v. Berisha, 925 F.2d 791, 794 (5th Cir.1991).
[4] Before 1986 subsection (b) of 5317 initially read:

A customs officer may stop and search, without a search warrant, a vehicle, vessel, aircraft, or other conveyance, envelope or other container, or person entering or departing from the United States with respect to which or whom the officer has reasonable cause to believe there is a monetary instrument being transported in violation of section 5316 of this title.
[5] We have found, however, at least one Florida case that involved a border search at an international airport with a passenger returning to the United States. State v. Smith, 399 So.2d 22 (Fla. 3d DCA 1981).