PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3613
_____

UNITED STATES OF AMERICA,

Appellant

v.

STEVEN BAXTER
_____

On Appeal from the District Court
of the Virgin Islands
District Court No. 3-17-cr-00024-001
District Judge: The Honorable Curtis V. Gomez
_____

Argued December 11, 2019

Before: SMITH, *Chief Judge*, McKEE and SHWARTZ,
*Circuit Judges*

(Filed: February 21, 2020)

John M. Pellettieri                    [ARGUED]
United States Department of Justice
Appellate Section
Room 1264
950 Pennsylvania Avenue, N.W.
Washington, DC  20004

Everard E. Potter
Office of United States Attorney
5500 Veterans Drive
United States Courthouse, Suite 260
St. Thomas, VI  00802
        *Counsel for Appellant*

Joseph A. DiRuzzo, III              [ARGUED]
Daniel Lader
DiRuzzo & Company
401 East Las Olas Boulevard
Suite 1400
Fort Lauderdale, FL  33301

Michael L. Sheesley
P.O. Box 307728
St. Thomas, VI  00803
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

SMITH, *Chief Judge.*

Steven Baxter allegedly mailed two packages from South Carolina to St. Thomas, United States Virgin Islands. Upon arrival in St. Thomas, U.S. Customs and Border Protection (CBP) agents opened the packages and discovered that they contained guns. Baxter was apprehended and charged with two counts of illegal transport of a firearm. During his criminal proceeding, he moved to suppress the guns as the fruit of unreasonable searches which violated his Fourth Amendment rights. The District Court of the Virgin Islands agreed and granted the motion to suppress. The Government has appealed.

For the reasons that follow, we conclude that CBP permissibly conducted the searches pursuant to the border-search exception to the Fourth Amendment. Because the searches did not violate Baxter's constitutional rights, we will vacate the order granting the motion to suppress and remand for further proceedings.

## I.

### A.[1]

On March 31, 2017, CBP K-9 Officer Joseph Lopez was working at the Cyril E. King Airport in St. Thomas with his trained and certified canine, Bo. Per his routine daily duties, Lopez brought Bo into a cargo plane to inspect mail that was incoming to the Virgin Islands (also, "the VI"). Bo alerted to a package, signaling in a manner indicating the presence of drugs. The package purportedly had been sent by Jason Price, whose address was in South Carolina, and had been mailed to a Mekelya Meade in St. Thomas. It was labeled priority mail and weighed 3 pounds 2.2 ounces.

Officer Lopez reported the package to CBP Officer Richard Kouns, who removed it from the plane. Officer Kouns opened the box and brought out a piece of clothing that smelled strongly of marijuana, although no drugs were found in the package. When Officer Kouns returned the item to the box, a magazine and round of ammunition fell to the floor. The officers inspected the package more thoroughly and discovered the unassembled parts of a gun.

A few days later, on April 3, 2017, a postal inspector contacted CBP regarding another package which bore the

---

[1] The factual background is derived from the testimony presented during the June 4, 2018 suppression hearing.

same names and addresses as the March 31 package.[2] Officers Lopez and Kouns responded to the call and procured the package. Because of the addresses and the weight of the package,[3] Officer Kouns suspected it might contain another gun and decided to x-ray it. The x-ray revealed items that appeared to be a gun and ammunition. Officer Kouns then opened the package and discovered what were indeed a gun and ammunition.

The CBP officers contacted Homeland Security. Homeland Security Special Agent Alicia Blyden arranged a controlled delivery of the two packages. Authorities ultimately apprehended Steven Baxter as the alleged sender of the packages, and a grand jury charged him with two counts of illegal transport of a firearm under 18 U.S.C. § 922(a)(5).

## B.

Baxter moved to suppress the guns, claiming that CBP's warrantless searches of the two packages violated

---

[2] Two packages bearing these names were intercepted on April 3, 2017, but for present purposes, only one of the two (the package containing a gun) is relevant.

[3] While the record does not contain information specifying its precise weight, the second package weighed more than 13 ounces.

his Fourth Amendment rights.[4] After a hearing, the District Court initially denied suppression with respect to the March 31, 2017 search and ordered additional briefing as to the April 3, 2017 search. Subsequently, on November 26, 2018, the District Court vacated its earlier partial denial and issued a detailed forty-two page opinion granting the suppression motion in its entirety. *United States v. Baxter*, No. 2017-24, 2018 WL 6173880 (D.V.I. Nov. 26, 2018).

In its opinion, the District Court observed that the packages sent from South Carolina to St. Thomas "never left United States territory." *Id.* at *8. The District Court

---

[4] Before the District Court, the Government argued that Baxter lacked standing to challenge the searches because he lacked an expectation of privacy. Under its theory, because the packages were sent under the name Jason Price, only Price would have a legitimate expectation of privacy in the packages. The District Court rejected the Government's claim. On appeal, the Government has not pursued the standing issue. The standing inquiry for challenging a search under the Fourth Amendment is not a jurisdictional matter and therefore can be waived. *See United States v. Stearn*, 597 F.3d 540, 551 & n.11 (3d Cir. 2014). Because the Government has waived the issue on appeal, we will not consider whether Baxter has standing to challenge the searches. *See United States v. Joseph*, 730 F.3d 336, 341 (3d Cir. 2013).

posited that, under the Fourth Amendment, the packages "remain protected from a warrantless search unless . . . they are transferred to a foreign territory."[5] *Id.* at \*7. The District Court acknowledged that, while the Virgin Islands is not a "foreign territory" or a "foreign country," *id.* at \*7–\*9, nonetheless "[a]rguably . . . , some type of border—or an approximation of one—exists" between the mainland United States and the VI for certain customs purposes. *Id.* at \*14. But it concluded that searches at that customs border for purposes of enforcing customs laws are less important "than the interest of the United States in enforcing its own Constitution."[6] *Id.*

---

[5] The District Court observed that an exception applies if the warrantless search is conducted by a non-government agent, but such an exception is irrelevant to Baxter's case.

[6] The United States' interest in enforcing the Fourth Amendment is not typically considered when courts consider the balance of rights under the Fourth Amendment. Rather, the familiar balancing test weighs the Government's interest in conducting a search versus an individual's interest in being free from a search. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968) ("[T]here is no ready test for determining reasonableness [of a search] other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails." (citation omitted)).

7

Our Court's decision in *United States v. Hyde*, 37 F.3d 116 (3d Cir. 1994), established the applicability of the border-search exception to the Fourth Amendment at the customs border between the mainland United States and the Virgin Islands.[7]   Because the border-search exception permits the Government to conduct warrantless

---

[7] Following the Supreme Court's lead, *Hyde* framed the Government's power to conduct warrantless border searches as an "exception" to the Fourth Amendment's warrant requirement. *See*, *e.g.*, 37 F.3d at 119–20 (citing *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985), *United States v. Ramsey*, 431 U.S. 606, 620 (1977), and *United States v. 12 200-Ft. Reels of Film*, 413 U.S. 123, 125 (1973)).   Our reading of those cases suggests, however, that this is an imperfect locution: a border search is not an "exception" carved out from the Fourth Amendment's application, but rather a border search is a circumstance in which the Fourth Amendment was never intended to apply.  *See Hyde*, 37 F.3d at 119 ("The inapplicability of the Fourth Amendment to border searches was, to the [*Ramsey*] Court, evident: 'That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border. . . .'" (quoting 431 U.S. at 616)). Nonetheless, for consistency's sake, we employ the "exception" terminology here.

searches at the Virgin Islands customs border, the District Court had to distinguish *Hyde*. It did so by relying on the direction that the packages were traveling—*i.e.*, from the mainland to the Virgin Islands—not from the Virgin Islands to the mainland, as was the case in *Hyde*.

According to the District Court, 19 U.S.C. § 1467[8] authorizes customs inspections of persons and items upon entry *into* the United States, but "[t]he Court is aware of no statutory authority authorizing similar inspections of persons or items entering the United States Virgin Islands

---

[8] Section 1467 provides: "Whenever a vessel from a foreign port or place or from a port or place in any Territory or possession of the United States arrives at a port or place in the United States or the Virgin Islands, whether directly or via another port or place in the United States or the Virgin Islands, the appropriate customs officer for such port or place of arrival may, under such regulations as the Secretary of the Treasury may prescribe and for the purpose of assuring compliance with any law, regulation, or instruction which the Secretary of the Treasury or the Customs Service is authorized to enforce, cause inspection, examination, and search to be made of the persons, baggage, and merchandise discharged or unladen from such vessel, whether or not any or all such persons, baggage, or merchandise has previously been inspected, examined, or searched by officers of the customs."

from the United States mainland." *Baxter*, 2018 WL 6173880, at *15. In addition, the District Court weighed the interests at play and concluded that the balance is different than that struck in *Hyde*. The District Court weighed the Government's interest in conducting the searches for customs enforcement purposes against individuals' personal privacy interest in mailed packages and determined "that the government's interest in conducting the type of search at issue here is less compelling than the government's interest in conducting the searches at issue in *Hyde*. In addition, the intrusion on privacy here is more significant than the intrusion presented in *Hyde*." *Id.* at *14 n.7. Thus, it concluded that, when traveling *into* the Virgin Islands, the personal interest prevails, and "the warrantless searches of the sealed mail packages in this matter were not reasonable." *Id.*

The District Court reiterated, "[i]t is axiomatic that those things that originate in, and stay within, the territory of the United States remain free from border searches." *Id.* at *15. Accordingly, the District Court granted Baxter's motion to suppress the firearms.

10

II.

A.

The Government timely appealed. We have jurisdiction over the Government's appeal of the order suppressing evidence pursuant to 18 U.S.C. § 3731. We review the District Court's legal conclusions *de novo*. *See Hyde*, 37 F.3d at 118.

B.

Because we disagree with the District Court's conclusion that *Hyde* is inapposite, we begin by turning our attention to that case. In *Hyde*, three individuals were attempting to board a flight from St. Thomas to Miami, Florida. After the individuals were stopped by Customs, inspectors conducted pat-downs and discovered cocaine taped to their bodies under their clothes. The defendants moved to suppress the cocaine as the fruit of unconstitutional searches. The District Court granted the suppression motions. On appeal, the Government argued that the warrantless searches were constitutional under the border-search exception to the Fourth Amendment. We agreed, concluding that an individual "may be subjected to a routine customs search prior to departure in the

absence of any degree of suspicion that the individual is engaged in wrongdoing." 37 F.3d at 118.

We first acknowledged the general rule that "warrantless searches are presumptively unreasonable." *Id.* (quoting *Horton v. California*, 496 U.S. 128, 133 (1990)). But we also pointed out that searches at a border are, and always have been, a fundamentally different category of search. Border searches are one of those "limited situations [in which] the government's interest in conducting a search without a warrant outweighs the individual's privacy interest." *Id.* As such, "searches at a border, without probable cause and without a warrant, are nonetheless 'reasonable.'" *Id.* at 118. Indeed, we reasoned that going back to our country's founding, the very first Congress—the same Congress that proposed the Bill of Rights—specifically authorized warrantless border searches for the purpose of collecting customs duties, and "did not intend such searches to come within the prohibitions of the Fourth Amendment." *Id.* at 119.

We observed in *Hyde* that the Supreme Court has recognized, explained, and reaffirmed the border-search exception in several cases. *See id.* at 119–20 (citing cases). Historically, the Government's broad power to conduct border searches has been necessary to prevent smuggling and to prevent prohibited articles from entering the country. *See United States v. 12 200-Ft. Reels of Super 8MM Film*, 413 U.S. 123, 125 (1973). Border-search

12

jurisprudence demonstrates that the Supreme Court has "faithfully adhered to" the view that "border searches were not subject to the warrant provisions of the Fourth Amendment and were 'reasonable' within the meaning of that Amendment." *United States v. Ramsey*, 431 U.S. 606, 617 (1977). The border-search exception is grounded in the sovereign's right to control "who and what may enter the country," and for that reason, individuals have "limited justifiable expectations of privacy" when presenting themselves or their mailed parcels for entry at a border.[9] *Id.* at 620, 623 n.17. Thus, the balance between an individual's lesser expectation of privacy at a border tilts more favorably to the Government, which has a heightened interest in regulating the collection of duties and preventing the entry of contraband. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 539–40 (1985).

We acknowledged in *Hyde* that the Supreme Court has applied the border-search exception only when an international boundary "or its functional equivalent"[10] is at

---

[9] In *Ramsey*, the Supreme Court concluded that the border-search exception applies to mailed letters in the same way it applies to individuals. *See Ramsey*, 431 U.S. at 620.
[10] The "functional equivalent" of an international border may, for instance, be an airport, if the airport is the first point of landing after a nonstop flight from abroad. *Hyde*,

play.  *Hyde*, 37 F.3d at 120.  The border between the United States and the Virgin Islands is neither an international boundary nor its functional equivalent, and so the Supreme Court's border-search exception cases did not, by themselves, control our decision in *Hyde*.  *Id.* at 122.  Nonetheless, we decided that the rationale of the Supreme Court's international border-search cases applies with equal force at the customs border that Congress established between the mainland United States and the Virgin Islands.[11]  *Id*.

---

37 F.3d at 120 n.2 (citing *United States v. Caminos*, 770 F.2d 361, 364 (3d Cir. 1985)).

[11] The Virgin Islands is an "unincorporated American territory."  *See Vooys v. Bentley*, 901 F.3d 172, 176 (3d Cir. 2018) (en banc).  That is, the VI has not been "incorporated" into the United States on a path to statehood.  *Id.* at 176 n.10.  Because of its unincorporated territory status, Congress "has the authority to create a border for customs purposes" between the VI and the rest of the country.  *Hyde*, 37 F.3d at 121.  Consistent with that authority, in the Tariff Act of 1930 (which remains in effect today), Congress specified that the customs territory of the United States excludes the Virgin Islands.  *Id*.; *see* 19 U.S.C. § 1401(h) ("The term 'United States' includes all Territories and possessions of the United States except the Virgin Islands, American Samoa, Wake Island,

14

Like searches at an international border, routine warrantless searches at the Virgin Islands customs border would serve the United States' interest in regulating its customs system. *Id.* "Routine warrantless border searches without probable cause would appear to be as essential to the accomplishment of the objects of that customs border as similar traditional searches have universally been recognized to be to the objectives of traditional customs systems at international borders." *Id.* And, on "the other side of the balance," we observed that individuals at the customs border, like at an international border, have a lesser privacy expectation than they would within the mainland United States. *Id.* Thus, the searches of the *Hyde* defendants were reasonable and did not offend the Fourth Amendment. *Id.*

We completed our analysis in *Hyde* with the observation that the application of the border-search exception at the customs border is consistent with the protections of the Fourth Amendment, which apply *within* the territory of the Virgin Islands. *See* Revised Organic Act of 1954, 48 U.S.C. § 1561 ("The right to be secure against unreasonable searches and seizures shall not be violated. No warrant for arrest or search shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and

Midway Islands, Kingman Reef, Johnston Island, and the island of Guam.").

15

the persons or things to be seized."). The existence of Fourth Amendment protections within the Virgin Islands does not undermine Congress's ability to direct that a customs border exists *between* the United States mainland and the Virgin Islands and to protect that customs border by conducting searches that are "essential to the effective surveillance of the customs border and to the efficient collection of the duties Congress had imposed." *Hyde*, 37 F.3d at 123.

In sum, *Hyde* established that the border-search exception to the Fourth Amendment permits routine warrantless customs searches at the customs border between the mainland United States and the Virgin Islands.[12] *Hyde*'s vitality is undiminished today.

---

[12] *Hyde* held that warrantless searches at the customs border are constitutionally permissible for the purpose of surveillance of that border and collection of customs duties. In Baxter's case, however, it is immaterial whether the CBP officers conducted the searches of Baxter's packages for the specific purposes that were discussed in *Hyde*. Rather, as the Supreme Court held in *Whren v. United States*, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." 517 U.S. 806, 813 (1996). Moreover, although *Hyde* concerned searches of individuals who were crossing the customs border, *Hyde*'s rationale applies to mailed packages as well. As the Supreme Court made clear in

16

C.

The routine customs searches of Baxter's packages were reasonable under *Hyde* unless, as the District Court held, it makes a difference that the packages were leaving the mainland United States rather than entering into it.[13]

---

*Ramsey*, as far as the applicability of the border-search exception is concerned, there is no distinction between persons and mailed items. *See Ramsey*, 431 U.S. at 620 ("The critical fact is that the envelopes cross the border and enter this country, not that th[ey] are brought in by one mode of transportation rather than another. It is their entry into this country from without that makes a resulting search 'reasonable.'").

[13] Neither party has suggested that CBP's searches of Baxter's packages qualify as anything other than routine customs searches. We are aware that appellate courts have held that a customs search that poses a serious invasion of privacy and that would offend the average traveler—like a body-cavity or strip search—is non-routine and thus subject to heightened Fourth Amendment scrutiny. *United States v. Whitted*, 541 F.3d 480, 485–86 (3d Cir. 2008) (collecting cases); *United States v. Johnson*, 991 F.2d 1287, 1291 (7th Cir. 1993). The searches of the mailed packages here fall far below that level of intrusion. Accordingly, there is no need for us to consider what constitutional requirements apply to a non-routine customs search. *See id.* ("When a border search and

17

We conclude that this directional distinction should have made no material difference to the District Court's analysis. The border-search exception applies regardless of the direction of a border crossing.

In *United States v. Ezeiruaku*, 936 F.2d 136 (3d Cir. 1991), we considered the applicability of the border-search exception to searches of luggage traveling across the international border out of the United States. Specifically, customs inspectors at the Philadelphia International Airport conducted a warrantless search of Ezeiruaku's suitcases, which were about to be loaded onto an outgoing flight to Frankfurt, Germany.[14] The inspectors discovered $265,000 of unreported cash in one suitcase. Ezeiruaku was charged with one count of exporting unreported currency, and he moved to suppress the cash as fruit of an unconstitutional search. The District Court granted the motion.

We reversed, rejecting Ezeiruaku's claim that the border-search exception does not apply to articles leaving the United States. *Id.* at 143. Consistent with every Court of Appeals to have considered the issue, we concluded that

---

seizure becomes nonroutine, a customs official needs reasonable suspicion to justify it.").

[14] Because it was the last point of departure before an international flight, the Philadelphia International Airport was the functional equivalent of an international border. *Ezeiruaku*, 936 F.2d at 139.

"the traditional rationale for the border search exception applies as well in the outgoing border search context."[15] *Id*. Thus, "[b]ecause the luggage . . . was at the functional equivalent of the border, we [held] that no warrant, reasonable suspicion or probable cause was needed to justify the search." *Id.*

Baxter is correct in observing that the Supreme Court's border-search cases primarily discuss the United States' interest in protecting its borders from illicit entry of persons and goods *into* the United States. *See*, *e.g.*, *Ramsey*, 431 U.S. at 620. This observation does not, however, undermine the policy reasons we took into account in *Ezeiruaku* that justify applying the border-search exception to any border crossing, regardless of the direction. The United States has an interest in monitoring

---

[15] At the time *Ezeiruaku* was decided, the Second, Fifth, Eighth, Ninth, and Eleventh Circuit Courts of Appeals had held that the border-search exception applies regardless of the direction of the border crossing. *See Ezeiruaku*, 936 F.2d at 141–43. Since then, the First, Fourth, and Sixth Circuit Courts of Appeals have joined the consensus. *See United States v. Boumelhem*, 339 F.3d 414, 422 (6th Cir. 2003); *United States v. Beras*, 183 F.3d 22, 26 (1st Cir. 1999); *United States v. Oriakhi*, 57 F.3d 1290, 1297 (4th Cir. 1995). We are aware of no Court of Appeals to have reached a contrary conclusion.

persons and items that exit the country as well as those that enter it. *Ezeiruaku*, 936 F.2d at 143.

Indeed, in both *Hyde* and *Ezeiruaku*, we drew support for our conclusions based on public policy concerns. We recognized in *Hyde* that the United States has an interest in regulating commerce to enforce its customs border with the Virgin Islands. *See Hyde*, 37 F.3d at 122. This interest applies to goods and currency both entering and leaving the mainland by crossing that customs border. Moreover, we observed in *Ezeiruaku* that the Government's concern with the influx of illicit items into the United States, such as drugs or similar contraband, gives rise to a parallel interest in monitoring the outflow of unreported cash that may be supporting the illegal narcotics trade. 936 F.2d at 143. So, even though drug trade was not at issue in Ezeiruaku's case, "in an environment that sees a massive importation of drugs across our borders, . . . [s]trong dictates of public policy reinforce the necessity of identifying, if not monitoring or controlling, a cash outflow from the country as well as an influx of narcotics into the country." *Id.* The United States has similar interests at the Virgin Islands customs border.[16]

---

[16] Indeed, the United States has an additional interest in protecting its territories from the entry of illicit items like drugs and guns.

20

Thus, under *Ezeiruaku*, the direction of travel does not impact the applicability of the border-search exception.  The District Court erred in concluding otherwise.

D.

Apart from his Fourth Amendment claim, Baxter also contends that the regulations that authorized the CBP officers' searches of the mailed packages are unconstitutional and invalid for failure to comply with the Administrative Procedure Act.[17]  Baxter challenges: (1) 19 C.F.R. § 145.1, a regulation that defines certain classes of mail; (2) 19 C.F.R. § 145.2, which authorizes, *inter alia*, customs examination of "all mail arriving from outside the U.S. Virgin Islands which is to be delivered within the U.S. Virgin Islands"; and (3) United States Postal Service Domestic Mail Manual § 101.6.1, which provides that mail weighing over 13 ounces is "priority mail."  When considered in tandem, these three regulations authorized CBP officers to conduct the customs searches of the two packages here.[18]

---

[17] Baxter does not claim that the CBP officers violated any applicable statute or regulation in conducting the searches.

[18] Due to their weight, Baxter's packages qualified as "priority mail," not "first class mail," which is described in USPS Domestic Mail Manual § 101.6.1, or as "sealed letter class mail," described in 19 C.F.R. § 145.1.  By

Baxter argues that these provisions are invalid for three reasons: the regulations (1) were issued in the absence of proper notice and comment procedures, 5 U.S.C. § 553(b), (c); (2) are arbitrary and capricious, 5 U.S.C. § 706(2)(A); and (3) constitute a violation of the nondelegation doctrine. The Government vigorously disputes each of these claims.

Baxter concedes, as he must, that he never presented these claims to the District Court, and so the District Court was never given the opportunity to consider them. These arguments could and should have been presented to the District Court in the first instance. Because these issues were asserted for the first time on appeal, we deem them forfeited and will not consider them. *See Gov't of the V.I. v. Rosa*, 399 F.3d 283, 291 (3d Cir. 2005).

III.

Border searches "have a unique status in constitutional law." *Ezeiruaku*, 936 F.2d at 142 (quoting *United States v. Vega-Barvo*, 729 F.2d 1341, 1344 (11th Cir. 1984)). Indeed, the "longstanding recognition that

regulation, first class mail and sealed letter class mail are subject to heightened requirements prior to customs inspection. *See* 19 C.F.R. § 145.3(b), (e). The packages at issue here did not qualify for the benefit of those heightened protections and therefore were subject to customs inspection under 19 C.F.R. § 145.2.

22

searches at our borders without probable cause and without a warrant are nonetheless 'reasonable' has a history as old as the Fourth Amendment itself." *Ramsey*, 431 U.S. at 619.

The searches of the two packages here, which occurred at the Virgin Islands customs border, were routine customs searches that were reasonable under the border-search exception to the Fourth Amendment. *See Hyde*, 37 F.3d at 122; *Ezeiruaku*, 936 F.2d at 143. Because the searches did not violate Baxter's Fourth Amendment rights, the District Court erred by suppressing the fruit of those searches. We therefore will vacate the judgment and remand the matter to the District Court.

23